**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

VOLKSWAGEN AG, VOLKSWAGEN OF
AMERICA, INC. and BUGATTI
INTERNATIONAL, S.A.

      Plaintiffs and Counterclaim Defendants,

      v.

THE BUGATTI, INC.

      Defendant and Counterclaim Plaintiff.

**Civil Action No.  05-11067-PBS**

**<u>APPENDIX OF UNPUBLISHED LEGAL AUTHORITIES CITED
IN THE MEMORANDUM IN SUPPORT OF THE BUGATTI INC.'S MOTION TO
COMPEL RESPONSES TO OUTSTANDING DISCOVERY REQUESTS FROM
PLAINTIFFS VOLKSWAGEN A.G. AND BUGATTI INTERNATIONAL S.A.</u>**

*The Network Network v. CBS, Inc.,* 2000 WL 362016, 54 U.S.P.Q.2d 1150
(C.D. Cal. Jan. 18, 2000) .................................................................................... Tab A

*First Niagara Ins. Brokers, Inc. v. First Niagara Fin. Group, Inc.,* 2005 WL 2865269,
77 U.S.P.Q.2d 1334 (TTAB 2005) ....................................................................Tab B

*Mother's Restaurants Inc. v. Mother Other Kitchen, Inc.,* 1983 WL 51992,
218 U.S.P.Q. 1046 (TTAB 1983) .......................................................................Tab C

*Vaudable v. Montmartre, Inc.,* 123 U.S.P.Q. 357, 193 N.Y.S.2d 332 (1959) ........................ Tab D

**EXHIBIT A**

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2000 WL 362016 (C.D.Cal.), 54 U.S.P.Q.2d 1150
(Cite as: Not Reported in F.Supp.2d)

C

United States District Court, C.D. California.
THE NETWORK NETWORK, Plaintiff,
v.
CBS, INC., and Does 1 to 10, Defendants.
No. CV 98-1349 NM(ANX).

Jan. 18, 2000.

ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND GRANTING
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT IN PART

MANELLA, J.

I

Introduction

*1 Plaintiff The Network Network brought this case
against defendan. CBS, Inc. [FN1] on February 5, 1998,
seeking a declaratory judgment that its use of the
Internet domain name "tnn.com" does not infringe
any of defendant's rights. Defendant filed a motion
for summary judgment on June 23, 1999, alleging
that plaintiff's use of the domain name infringed and
diluted its trademark under both federal and state law.
Plaintiff filed its own summary judgment motion on
June 30, claiming that it is entitled to a declaratory
judgment of non-infringement and non-dilution as a
matter of law, and contending that defendant is
barred from its counterclaim under federal and state
laches doctrine.

FN1. Defendant states in its answer to the
complaint that suit should have been filed
against "Network Enterprises, Inc.," a
wholly-owned subsidiary of CBS that
acquired The Nashville Network on October
1, 1997.

II

Background Facts

The following facts are undisputed unless otherwise
indicated.

Opryland USA, Inc. registered the service mark
"TNN" on the Principal Register of the United States
Patent and Trademark Office on January 20, 1987.
The mark is shorthand for "The Nashville Network,"
described as "a cable television network that
broadcasts country music and country lifestyle
programs." Def. Mot. at 1. According to the
trademark registration form, the mark was intended
for use in "television program production services
and distribution of television programming to cable
television systems." The form lists April 1, 1981 as
the first date the mark was used in commerce. See
Wilson Dec., Exh. A. The cable station went on the
air March 7, 1983. See Daly Dec. ¶ 4. To avoid
confusion, the cable station (and its parent company,
unless otherwise specified) will be referred to herein
as "Nashville." [FN2] The stock of Opryland USA, Inc
was spun off to Gaylord Entertainment, Co., on
October 23, 1991. See Wilson Dec. ¶ 8.

FN2. The designation is necessary to refer to
the cable station entity because the entity's
promotion of the mark, apart from the
ownership of the station at the time of the
promotion, is at issue in this case.

Clive Hermann formed The Network Network
("Network") in October 1986. See Clive Hermann
Dec. ¶ 3; id. Exh. 1. Network "provide[s] consulting
and training to IT [Information Technology]
managers and professionals concerning the
establishment and maintenance of computer
networks." Pl. Mot. at 1. The business was
incorporated in California November 30, 1988. See
id. ¶ 6. Hermann alleges that plaintiff has been using
"TNN" as a common law service mark for the
company continuously since October 1986, and has
used the same stylized logo with the initials since
1989 during the company's seminars, on its training
manuals, and on some correspondence. See id. ¶¶ 7-
8; C. Herman Dec. Exh. 4.

Plaintiff registered the Internet domain name
"tnn.com" on January 7, 1994. It immediately began
using the domain name for email addresses, and
several months later created a website at
www.tnn.com. It began publicizing both the site and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 2
Not Reported in F.Supp.2d, 2000 WL 362016 (C.D.Cal.), 54 U.S.P.Q.2d 1150
**(Cite as: Not Reported in F.Supp.2d)**

the email addresses to clients during this period. *See*
Pl. Mot. at 3.

On September 30, 1997, CBS, Inc. acquired
Nashville from Gaylord and assigned ownership
rights of the "TNN" mark to a subsidiary, NEI. *See*
Wilson Dec. ¶ 9. On December 16, 1997, an attorney
from CBS sent Hermann a "cease and desist" letter
regarding the use of the domain name.

### III

### Analysis

*A. Summary Judgment Standard*

**\*2** Summary judgment is appropriate when "the
pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to
judgment as a matter of law." Fed.R.Civ.P. 56(c).

In a trio of 1986 cases, the Supreme Court clarified
the applicable standards for summary judgment. *See
Celotex, supra; Anderson v. Liberty Lobby, Inc.,* 477
U.S. 242, 106 S.Ct. 2505 (1986); *Matsushita
Electrical Industry Co. v. Zenith Radio Corp.,* 475
U.S. 574, 106 S.Ct. 1348 (1986). The moving party
bears the initial burden of demonstrating the absence
of a genuine issue of material fact. *See Anderson,* 477
U.S. at 256, 106 S .Ct. at 2514. The governing
substantive law dictates whether a fact is material; if
the fact may affect the outcome, it is material. *See id.*
at 248, 2510. If the moving party seeks summary
adjudication with respect to a claim or defense upon
which it bears the burden of proof at trial, it must
satisfy its burden with affirmative, admissible
evidence. By contrast, when the non-moving party
bears the burden of proving the claim or defense, the
moving party can meet its burden by pointing out the
absence of evidence submitted by the non-moving
party. The moving party need not disprove the other
party's case. *See Celotex Corporation v. Catrett,* 477
U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986).

If the moving party meets its initial burden, the
"adverse party may not rest upon the mere allegations
or denials of the adverse party's pleadings, but the
adverse party's response, by affidavits or as otherwise
provided in this rule, must set forth specific facts
showing that there is a genuine issue for trial."

Fed.R.Civ.P. 56(e).

When assessing whether the non-moving party has
raised a genuine issue, the court must believe the
evidence and draw all justifiable inferences in the
non-movant's favor. *Anderson,* 477 U.S. at 255, 106
S.Ct. at 2513 (citing *Adickes v. S.H. Kress and
Company,* 398 U.S. 144, 158-59, 90 S.Ct. 1598,
1608-09 (1970)). Nonetheless, "the mere existence of
a scintilla of evidence" is insufficient to create a
genuine issue of material fact. *Id.* at 252, 2512. As
the Supreme Court explained in *Matsushita,*
[w]hen the moving party has carried its burden under
Rule 56(c), its opponent must do more than simply
show that there is some metaphysical doubt as to the
material facts.... Where the record taken as a whole
could not lead a rational trier of fact to find for the
nonmoving party, there is no "genuine issue for
trial."

*Id.* at 586-87, 106 S.Ct. at 1356 (citations omitted).

To be admissible for purposes of summary judgment,
declarations or affidavits must be based on personal
knowledge, must set forth "such facts as would be
admissible in evidence," and must show that the
declarant or affiant is competent to testify concerning
the facts at issue. Fed.R.Civ.P. 56(e). Declarations on
information and belief are insufficient to establish a
factual dispute for purposes of summary judgment.
*Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989).

*B. Claim Analysis*

*1. Dilution*

a. Federal Law: The FTDA

The Federal Trademark Dilution Act (FTDA),
codified as 15 U.S.C. § 1125(c)(1), allows a **famous**
mark's owner to secure an injunction against another
party's **"commercial use in commerce"** of the mark
"if such **use** begins after the mark has become
**famous** and causes dilution of the distinctive quality
of the mark." The parties dispute whether Nashville's
"TNN" mark is **famous** within the meaning of the
statute, as well as the meaning of the phrase "begins
after the mark has become **famous**." The latter
dispute, in turn, has sparked two subsidiary debates:
whether "such **use** begins" refers to the first use of
any **use** of the mark (here, Network **used** the initials
"TNN" in business correspondence in November

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 3
Not Reported in F.Supp.2d, 2000 WL 362016 (C.D.Cal.), 54 U.S.P.Q.2d 1150
(Cite as: Not Reported in F.Supp.2d)

1987, and used "TNN" in its seminars by 1989, [FN3] see C. Hermann Dec. Exhs. 2, 4 and accompanying videotape), or the first date the mark was used in a manner the mark's holder finds objectionable (here, the date that Network registered the initials "TNN" as its domain name -January 1994); and, if Nashville's mark is indeed **"famous"** under the meaning of the statute, when it became so.

> FN3. At oral argument, defendant's counsel alleged that Network's early use of "TNN" was always in conjunction with "The Network Network." Although graphics at the outset of Network's videotaped seminar from 1989 do indeed say "TNN: The Network Network," the presentation itself uses the "TNN" logo alone as a backdrop.

Professor McCarthy explains this timing issue as follows:

[O]ne should not be liable for dilution by the use of a mark which was legal when first used. That is, if at the time of first use, Zeta's mark did not dilute Alpha's mark because Alpha's mark was not famous, then Alpha will not at some future time have a federal dilution claim against Zeta's mark. Thus, the junior user must be proven to have first used its mark after the time that plaintiff's mark achieved fame. This requires evidence and proof of the timing of two events: when the plaintiff's mark achieved that elevated status called **"fame"** and when the defendant made its first use of its mark.

4 McCarthy 24:96 at 24-169. McCarthy's reading is consistent with the language of the statute, which speaks of a party's right to injunctive relief against another's **"commercial use in commerce of a mark or trade name,** *if such use* **begins after the mark has become famous"** 15 U.S.C. § 1125(c)(1) (emphasis added). Under ordinary rules of construction, the term "such use" must relate back to **"commercial use in commerce."** The term **"use in commerce"** is defined in the **Lanham Act** as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." A mark, in turn, "shall be deemed in **use in commerce** on services when it is **used** or displayed in the sale or advertising or services and the services are rendered in **commerce"** 15 U.S.C. § 1127. It is undisputed that Network was **using** the mark "TNN" in **commerce** at least as early as 1989.

It appears from this formulation that the statute looks to the mark's **fame** at the time of the mark's first

commercial use, not when the first use occurs that the mark's owner finds objectionable. Indeed, if this latter formulation were the rule, the requirement that infringing use begin after the mark becomes famous would be stripped of all meaning. Owners of famous marks would have the authority to decide when an allegedly diluting use was objectionable, regardless of when the party accused of diluting first began to use the mark. Nashville contends that Network's proposed formulation would allow *any* prior single use by another party to strip the famous mark's owner of its ability to protect its mark. Because the evidence indicates that Network's use of "TNN" has been continuous since at least 1989, the Court need not decide whether an isolated previous use is sufficient to change the date of the famousness analysis. Nashville has not set forth any evidence of the famousness of its mark as of 1989.

*4 Also relevant to Nashville's dilution claim is the fact that it did not complain about Network's registration of the "tnn.com" domain name for nearly four years, indicating it did not sense a threat of dilution from Network's use of the domain until relatively recently. Regardless of when Nashville discovered that Network had registered the domain name, it certainly should have been aware of the existence of the Internet, of the practice of registering domain names, and of the likelihood that an existing organization with the initials TNN would seek the most obvious domain name for its website -just as Nashville now wishes it had done. Indeed, a Nashville employee was aware of Network's site at "tnn.com" as of December 12, 1996, yet Nashville took no action at that time. *See* C. Hermann Dec. Exh. 10. The length of time of concurrent usage of "tnn" before Nashville complained indicates that Network's activity did not seriously dilute the value of Nashville's trademark. *See Accuride Int'l, Inc. v. Accuride Corp., 871 F.2d 1531, 1539 (9th Cir.1989).*

Nashville has not shown that its mark was **famous** in 1989. Furthermore, it did not allege that Network's **use** of its domain name diluted its mark for almost four years after Network first registered the domain. For these reasons, the Court finds that Nashville's claim under the FTDA cannot survive summary judgment.

b. State Law: Cal. Bus. & Prof.Code § 14330

Dilution under state law is subject to essentially the same **analysis** as dilution under the FTDA. [FN4] *See Panavision Int'l v. Toeppen, 141 F.3d 1316, 1324*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 362016 (C.D.Cal.), 54 U.S.P.Q.2d 1150
(Cite as: Not Reported in F.Supp.2d)

(9th Cir.1998) ("Panavision's state law dilution claim is subject to the same **analysis** as its federal claim."). The parties dispute whether California law requires that a mark be **"famous"** or merely "strong and well recognized" to merit protection. However, the Ninth Circuit recently held that § 14330 applies only to **famous** marks, and that the allegedly diluting **use** must occur after the mark has become **famous** for the statute to apply. *See Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 874-75 & n.4 (9th Cir.1999). Accordingly, the same reasoning applies under both California state law and the FTDA, and the same outcome must result.

> FN4. The relevant California provision holds as follows:
> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.
> Cal. Bus. & Prof.Code § 14330.

### 2. Infringement

### a. Federal Law: **Lanham Act**

The **Lanham Act** provides the owner of a valid protectable trademark from an infringing **use** of the mark that creates a likelihood of confusion. *See* 15 U.S.C. § § 1114, 1125(a)(1). Much of the briefs of both parties is therefore devoted to determining whether intrepid Internet explorers, in search of information about Nashville's programming, are potentially confused when they alight, inadvertently, on Network's website.

Traditionally, likelihood of confusion analysis involves application of the eight-factor test enunciated in *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348-49 (9th Cir.1979). [FN5] As noted in *Bally Total Fitness Holding Corp. v. Faber,* 29 F.Supp.2d 1161 (C.D.Cal.1998), however, the *Sleekcraft* test applies only to related goods, which are those goods or services "which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Bally,* 29 F.Supp.2d at 1163 (quoting 4 McCarthy § 24:6 at

24-13 (1997)). The products at issue here, "a cable television network that broadcasts country music and country lifestyle programs," Def. Mot. at 1, and a service providing "consulting and training to I[nformation] T[echnology] managers and professionals concerning the establishment and maintenance of computer networks," Pl. Mot. at 1, could not possibly be associated by a rational buying public. The fact that both use the Internet as an advertising mechanism does not render the services related. As the *Bally* court noted, "The Internet is a communications medium. It is not itself a product or a service." *Bally,* 29 F.Supp.2d at 1163. Because the services of Nashville and Network are not reasonably related, there is no need to conduct the *Sleekcraft* analysis to determine likelihood of confusion. [FN6]

> FN5. The *Sleekcraft* factors are as follows: strength of the allegedly infringed mark, proximity of the goods, similarity of the marks, evidence of actual confusion, marketing channels used, type of goods and degree of care likely to be exercised by purchasers, the intent of the alleged infringer in selecting the mark, and the likelihood of the expansion of the product lines of both parties. *See Sleekcraft,* 599 F.2d at 348-49.

> FN6. Nashville contends that, because it has licensed its mark to a hunting simulation computer game, "[i]t is not unreasonable for television viewers of TNN's other customers to believe that TNN is sponsoring or affiliated with other computer-related products or services." D's Opp. at 14. This argument is wholly unpersuasive. The computer game, which publicity material bills as "the most realistic hunting simulation to date," P's Reply at 13, cannot arguably be confused as overlapping even slightly with Network's services, which include "a complete range of publicly offered training seminars, that meet the needs of IT Executives, IT personnel, and marketing personnel."

\*5 Nashville contends that Network's choice of domain name has caused substantial confusion. In support of this proposition, it cites several emails sent to Network asking for information on Nashville's programming. *See* Boese Dec. Exhs. F, G, H, I; Peterson Dec. It also produced several declarations of Internet users who attempted to reach Nashville's home page by entering "www . tnn.com" on their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 5
Not Reported in F.Supp.2d, 2000 WL 362016 (C.D.Cal.), 54 U.S.P.Q.2d 1150
**(Cite as: Not Reported in F.Supp.2d)**

web browsers, and were disappointed upon arriving at Network's home page. *See* Posey Dec., Frauenfelder Dec., Ridgway Dec.

There is a difference between inadvertently landing on a website and being confused. Thousands of Internet users every day take a stab at what they think is the most likely domain name for a particular website. Given the limited number of letters in the alphabet, and the tendency toward the use of abbreviations in commerce generally and in domain names in particular, it is inevitable that consumers will often guess wrong. But the fact that afficionados of The Nashville Network may initially type "tnn.com" into their browsers in the hope of locating Grand Ole Opry programming information does not, standing alone, demonstrate confusion.

Of the few examples put forth by Nashville, only five can be said to show any degree of actual confusion. *See* Boese Dec. Exhs. F, G, H, I; Peterson Dec. Others quickly realized that they were in the wrong website. Contrary to Nashville's assertion, the fact that someone was momentarily confused does not resolve the question. The test of actual confusion is not whether anyone *could possibly* be confused, but whether the "reasonably prudent consumer" is likely to be confused. *Brookfield Communications v. West Coast Entertainment Corp., 174 F.3d 1036, 1060 (9th Cir.1999); Dreamwerks Production Group, Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir.1998); Sleekcraft, 599 F.2d at 353.* The Court can conceive of few, if any, circumstances in which a person of average intelligence, seeking information on NASCAR racing schedules, would be seriously confused upon reaching Network's website which, by its terms, offers "Strategic Planning, design, implementation, and management of Broadband Voice/Data/Video Networks."

Nashville responds by suggesting that the number of users actually confused is much greater than the examples proffered to the Court. Especially in relation to low-cost goods, Nashville argues, deceived customers will often not realize their confusion, or will not be sufficiently motivated to voice their concern at having been deceived. *See* Def. Reply at 9.

Nashville quotes *AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531 (11th Cir.1987)* at length in support of these propositions. *AmBrit* involved an ice cream bar manufacturer's trade dress suit against a competitor. After describing the similarity of the products at issue, the court declared, "Actual consumer

confusion is the best evidence of likelihood of confusion. There is no absolute scale as to how many instances of actual confusion establish the existence of that factor. Rather, the court must evaluate the evidence of actual confusion in the light of the totality of the circumstances involved." *AmBrit, 812 F.2d at 1543.* In conducting its contextual analysis, the court stated that confusion is especially difficult to detect when "the goods are relatively inexpensive and their actual properties are exactly identical," and reflected that many victims of confusion, upon realizing that they had been duped, "chose not to spend the time to register a complaint with a faceless corporation about the packaging of an item that retails for approximately $2.50 per six-pack." *Id. at 1544.* Finally, the court noted that the evidence of confusion was "far from overwhelming," but sufficient to meet the clear error standard applied in reviewing the case. *Id. at 1544-45.*

*6 AmBrit's* propositions, while valid in their particular context, do not apply to the instant case. Consumers in search of information about Nashville's broadcasts will realize that the information they have inadvertently acquired from Network's web site is not what they were looking for, regardless of the low cost of the product at issue. Far from being "exactly identical," the information available from Nashville and Network has no overlap. Furthermore, the convenience of email communication - especially when one is already engaged in Internet use - eviscerates Nashville's cost-of-customer-communication argument. If one is frustrated during a search for information, she can communicate this frustration electronically to the operator of the offending web site with a few mouse clicks and keystrokes, taking virtually no time at all. While Nashville's email communications evidence might indicate that a number of users accidentally accessed Network's site while looking for Nashville's information, the evidence does not show that ongoing consumer confusion results from Network's use of the "tnn.com" domain.

The recent Ninth Circuit decision in *Interstellar Starship Servs., Ltd. v. Epix, 184 F.3d 1107 (9th Cir.1999)* sheds some light on Internet domain name confusion issues, but is ultimately inapplicable to the instant dispute. In *Interstellar,* Epix, Inc., a manufacturer of video imaging hardware and software, had registered the name "EPIX" with the United States Patent and Trademark Office. Epix sought the rights to the domain address "epix.com," currently owned by Interstellar Starship Services (ISS). ISS's Michael Tchou, a photographer affiliated

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2000 WL 362016 (C.D.Cal.), 54 U.S.P.Q.2d 1150
(Cite as: Not Reported in F.Supp.2d)

with a dramatic group that stages performances of the Rocky Horror Picture Show, uses the site to display his photos of some of these performances, and hopes to use it in the future "as a photo gallery and as a showcase for my work and for the work of other photographers who specialize in unusual or difficult fields of photography." Michael R. Tchou, *Question: What is the Purpose of this Web Site?* (last modified July 26, 1999) < http:www.epix.com>.

Because the *Interstellar* court recognized the legitimacy of an infringement claim based on "initial interest confusion" (addressed *infra* ), and because it found that the possibility of an Epix customer inadvertently finding Tchou's site and becoming interested in ISS's services arguably existed, *see Interstellar,* 184 F.3d at 1111, sufficient likelihood of confusion existed to warrant a trial on the trademark infringement issue. This conclusion apparently resulted from the court's impression that customers in the market for Epix, Inc.'s video imaging services would tend to have an interest in Tchou's method of photograph alteration and display. ISS would therefore be capitalizing on Epix's goodwill with every new customer it derived through this channel. [FN7] *See id.* Despite a lack of confusion in this scenario, the court's conclusion is clearly premised on at least a tangential relationship between the goods offered by Epix and those of ISS, creating the possibility that "[a]n Epix customer might read about ISS on the 'epix.com' site and decide to give ISS's services a try ..." *Id.* Because the services offered by Nashville and Network are wholly distinct, the scenario described in *Interstellar* is not even arguably a possibility in the instant case. Its reasoning, therefore, does not apply.

FN7. Nashville does not - and, indeed, could not - claim that Network is attempting to appropriate its goodwill inthe latter's use of the "tnn.com" domain name. In a letter to Nashville's counsel, Network offered to negotiate to include a link from its website to Nashville's "www.country.com." *See* Boese Supp. Dec. Exh. W. Nashville apparently decided not to pursue this avenue of discussions.

**\*7** Nashville also claims that Network's use of the "tnn.com" domain name creates "initial interest confusion" among Internet users, thus infringing the "TNN" mark in violation of the Lanham Act. It points to *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036 (9th Cir.1999) to support this proposition. An examination of *Brookfield* shows this claim is without merit.

*Brookfield,* a company offering information for entertainment industry professionals, wanted to use "moviebuff.com" as the domain name for its site selling "MovieBuff" software that featured "comprehensive, searchable, entertainment-industry databases and related software applications." *Brookfield,* 174 F .3d at 1041. Brookfield had obtained a California state trademark for the "MovieBuff" mark applying to "computer software" in 1994, and in late September 1998 it secured federal registration for "the MovieBuff" mark designating "computer software providing data and information in the field of the motion picture and television industries" as its goods, and describing its services as the provision of "multiple-user access to an on-line network database offering data and information in the field of the motion picture and television industries." *Id.* at 1042.

West Coast, a large video rental chain, registered "moviebuff.com" in February, 1996. It claimed to have chosen the name based on its service mark, "The Movie Buff's Movie Store," which it began using in 1986 and federally registered in 1991. *See id.* at 1042-43. In October 1998, Brookfield became aware of West Coast's intent to launch a web site at "moviebuff.com" offering a searchable database with material similar to that offered by Brookfield's "MovieBuff" software.

The district court denied Brookfield's motion for a preliminary injunction. On appeal, the Ninth Circuit granted the injunction. The panel found that Brookfield was the senior user of the "MovieBuff" mark and that West Coast's use of "moviebuff.com" created a likelihood of confusion.

The court based its finding of seniority on several factors. First, because West Coast had only used the two-word phrase "Movie Buff" in its advertising, and as part of a longer phrase, the court found the date of registration and use of the phrase was "simply irrelevant" to the determination of its rights to the "moviebuff.com" domain name. *Id.* at 1049. Second, the court had to decide when West Coast's first use of the "moviebuff.com" site occurred. It concluded that such use could not be dated from West Coast's registration of the site, or even from when it first used the site name in correspondence with attorneys and customers (allegedly occurring in mid-1996). *See id.* at 1052. Instead, the court focused on November 11, 1998, the date that West Coast issued a press release

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 362016 (C.D.Cal.), 54 U.S.P.Q.2d 1150
(Cite as: Not Reported in F.Supp.2d)

Page 7

about the site. Because Brookfield had obtained federal registration of "MovieBuff" over a month prior to this date, the court determined that Brookfield was the senior user.

**\*8** In passing on the likelihood of consumer confusion, the court began with an analysis of the eight *Sleekcraft* factors. This investigation revealed that the marks were identical, the consuming public was likely to associate the goods and services offered by the parties, [FN8] and the use of overlapping marketing channels was likely to exacerbate this confusion, [FN9] all factors weighing in Brookfield's favor. The court found the strength of the mark and user intent factors inconclusive, and held that the final three factors -evidence of actual confusion, likelihood of product line expansion, and purchaser care [FN10] - would not affect the court's "ultimate conclusion regarding the likelihood of confusion." *Id.* at 1060.

> FN8. "Just as Brookfield's 'MovieBuff' is a searchable database with detailed information on films, West Coast's web site features a similar searchable database, which Brookfield points out is licensed from a direct competitor of Brookfield. Undeniably, then, the products are used for similar purposes." *Brookfield,* 174 F.3d at 1056.

> FN9. The court outlined a number of possible ways in which consumers might be confused by the concurrent use of Internet marketing by both parties. These included misperceptions about the site's ownership, the incorrect inference of an agreement between the parties, and a belief that one party's services were no longer offered. *See id.* at 1057.

> FN10. While the court noted several standards for determining purchaser care when different classes of relevant consumers could be expected to use varying levels of care, it refused to decide the issue because "the purchaser confusion factor, even considered in the light most favorable to West Coast, is not sufficient to overcome the likelihood of confusion strongly established by the other factors" the court examined. *Id.* at 1060.

The court then turned to the issue of "initial interest confusion," the situation that results when customers

realize that the site they have accessed is not the one they were looking for, but decide to use the offerings of the infringing site regardless. *Id.* at 1062. While the *Brookfield* court examined the issue in light of "metatags" that may be programmed into one's web site invisibly to communicate the site's content to search engines, Nashville argues, and this Court agrees, that the same analysis should apply when the inadvertent access occurs as a result of domain name similarities.

The *Brookfield* initial interest confusion analysis envisions an Internet user in search of one specific product who inadvertently comes upon a related one and uses that product instead. *See Brookfield,* 174 F.3d at 1062-65. The court noted that the infringer in this scenario "improperly benefits from the goodwill that [the infringed-upon owner] developed in its mark." *Id.* at 1062. To illustrate, the court posits a situation in which B erects signs purporting to lead the buying public to A's store, but actually directs them to B's establishment. Upon arriving at B's store, customers are fully aware that the store is not A's, but buy from B out of convenience. As *Brookfield* explains, customers are not confused in this example, but B is nevertheless "misappropriating [A]'s acquired goodwill" in violation of federal trademark law. *Id.* at 1064. Nashville explicitly recognizes that improper benefit from a mark holder's store of goodwill is a fundamental aspect of the initial interest confusion dynamic. *See* Def. Mot. at 23.

The instant case differs from *Brookfield* in each of these particulars, and as such warrants a different conclusion. First, Network has used exactly the same mark as the one it registered as a domain name - "TNN" - to denote its goods since at least as far back as 1989. Furthermore, much of the *Brookfield* likelihood of confusion analysis either explicitly or implicitly depended on the similarity of the products offered by the parties. Two of the three *Sleekcraft* factors the *Brookfield* court found important - association of the goods and services by the consuming public and the increased confusion created by overlapping marketing channels - are not present here. Though both companies use the Internet as a marketing device, the types of confusion potentially created by such a situation are not present where the goods and services offered are wholly distinct.

**\*9** *Brookfield* itself bolsters this conclusion. The court stated, "If ... Brookfield and West Coast did not compete to any extent whatsoever, the likelihood of confusion would probably be remote." *Id.* at 1056.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 362016 (C.D.Cal.), 54 U.S.P.Q.2d 1150
(Cite as: Not Reported in F.Supp.2d)

The hypothetical the court used to illustrate this point is instructive: "A Web surfer who accessed 'moviebuff.com' and reached a web site advertising the services of Schlumberger Ltd. (a large oil drilling company) would be unlikely to think that Brookfield had entered the oil drilling business or was sponsoring the oil driller." *Id.* This conclusion would no doubt resonate even if evidence were produced that a consumer in search of information about Alfred Hitchcock's oeuvre had dashed off a quick inquiry on the subject to Mr. Schlumberger.

Dissimilarity of goods and services resolves the initial interest confusion question. A trademark violation based on initial interest confusion involves the junior user capitalizing on the senior user's goodwill. The senior user's customers, at least tangentially in the market for the junior user's services, accidentally access the infringing site while in search of information on the senior user's products. Thus, relatedness of products is an important component in the analysis, even if the products need not be closely related. *See Interstellar,* 184 F.3d at 1111. Clearly, the instant dispute does not provide such a case. Unlikely indeed is the hapless Internet searcher who, unable to find information on the schedule of upcoming NASCAR broadcasts or "Dukes of Hazzard" reruns, decides to give up and purchase a computer network maintenance seminar instead.

   b. Unfair Competition: 15 U.S.C. § 1125(a) and California Business & Professions Code § 17200

Nashville bases this claim on Lanham Act § 43(a), which outlaws any **use** of a mark that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association" of the good with the owner of the mark. As described above, the Court finds no danger of confusion among reasonable consumers, so summary judgment must be granted on this claim in favor of Network.

Nashville also seeks an injunction based on California's Unfair Competition Act, Cal. Bus. & Prof.Code § § 17200 et seq. **Analysis** under this code is "substantially congruent to a trademark infringement claim under the **Lanham Act.**" *Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.,* 944 F.2d 1446, 1457 (9th Cir.1991) (internal quotations omitted). Because this **section** also depends on deception or confusion of the public, this claim must be rejected as well.

IV

Conclusion

Nashville's claim may be reduced to the argument that because its three-initial registered mark is now **famous**, and would be the most convenient website name for The Nashville Network, it should be entitled to enjoin The Network Network from **using** the same three initials as part of the domain name it registered nearly half a dozen years ago and has been **using** continuously ever since - a domain name based on Network's prior **use** in **commerce** of the same three initials since 1989. The fact that Nashville missed its opportunity to select the domain name it would now like to have is not sufficient to state a claim of infringement under the federal trademark laws, particularly where, as here, there can be no genuine risk of confusion - initial or otherwise - by any consumer of reasonable prudence, and no argument that Network has sought or is now seeking to trade on Nashville's good name.

**\*10** Based on the foregoing, defendant's motion for summary judgment is denied, and plaintiff's motion for summary judgment is granted as to both the infringement and the dilution claims.

IT IS SO ORDERED.

C.D.Cal.,2000.
Network Network v. CBS, Inc.
Not Reported in F.Supp.2d, 2000 WL 362016 (C.D.Cal.), 54 U.S.P.Q.2d 1150

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT B**

Westlaw.

2005 WL 2865169 (Trademark Tr. & App. Bd.), 77 U.S.P.Q.2d 1334
**(Cite as: 2005 WL 2865169 (Trademark Tr. & App. Bd.))**

*1 THIS OPINION IS CITABLE AS PRECEDENT OF THE TTAB

Trademark Trial and Appeal Board

Patent and Trademark Office (P.T.O.)
**FIRST NIAGARA** INSURANCE BROKERS, INC.
v.
**FIRST NIAGARA** FINANCIAL GROUP, INC. [FN2]
Opposition Nos. 91122072; 91122224; 91122193; 91122450; 91122712; 91150237
[FN3]
Mailed: October 21, 2005
Hearing: February 25, 2005 [FN1]

George Gottlieb and Barbara Loewenthal of Gottlieb, Rackman & Reisman for First Niagara Insurance Brokers, Inc.

Paul I. Perlman and David L. Principe of Hodgson Rush for Niagara Bancorp.

Before Sams, Walters and Walsh

Administrative Trademark Judges

Opinion by Walters

Administrative Trademark Judge:

First Niagara Insurance Brokers, Inc. filed its opposition to the applications of First Niagara Financial Group, Inc. listed below.

Application No. 75890902

Opposition No. 91122072

Mark: FIRST NIAGARA

Services:
IC 035: leasing of office equipment
IC 036: banking services; insurance services, namely, insurance brokerage, insurance agencies, insurance administration and insurance consultation, in the fields of life, property and casualty, accident, health and other insurance; credit insurance services; financial services, namely, financial and investment consulting, management and advisory services; investment and securities brokerage services; providing information on investment and securities performance; annuities services; charitable fund raising services
IC 037: leasing of construction equipment and building machinery
IC 039: leasing of motor vehicles

Filing Date: January 7, 2000

Basis: 1b

Disclaimer: FIRST

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
2005 WL 2865169 (Trademark Tr. & App. Bd.), 77 U.S.P.Q.2d 1334
(Cite as: 2005 WL 2865169 (Trademark Tr. & App. Bd.))
```

Application No. 75891547

Opposition No. 91122224

Mark: FIRST NIAGARA FINANCIAL GROUP

Services:
  IC 035: leasing of office equipment
  IC 036: banking services; insurance services, namely, insurance brokerage,
insurance agencies, insurance administration and insurance consultation, in the
fields of life, property and casualty, accident, health and other insurance; credit
insurance services; financial services, namely, financial and investment
consulting, management and advisory services; investment and securities brokerage
services; providing information on investment and securities performance; annuities
services; charitable fund raising services
  IC 037: leasing of construction equipment and building machinery
  IC 039: leasing of motor vehicles

Filing Date: January 7, 2000

Basis: 1b

Disclaimer: FIRST and FINANCIAL GROUP

Application No. 75890903

Opposition No. 91122193

Mark:



Services:
  IC 035: leasing of office equipment
  *2 IC 036: banking services; insurance services, namely, insurance brokerage,
insurance agencies, insurance administration and insurance consultation, in the
fields of life, property and casualty, accident, health and other insurance; credit
insurance services; financial services, namely, financial and investment
consulting, management and advisory services; investment and securities brokerage
services; providing information on investment and securities performance; annuities
services; charitable fund raising services
  IC 037: leasing of construction equipment and building machinery
  IC 039: leasing of motor vehicles

Filing Date: January 7, 2000

Basis: 1b

Disclaimer: FIRST

Application No. 76004229

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2865169 (Trademark Tr. & App. Bd.), 77 U.S.P.Q.2d 1334
**(Cite as: 2005 WL 2865169 (Trademark Tr. & App. Bd.))**

Opposition No. 91122450

Mark: FIRST NIAGARA ONLINE

Services:
    IC 036: banking services, namely, providing electronic banking services to customers via a global computer network

Filing Date: March 20, 2000

Basis: 1b

Disclaimer: ONLINE

Application No. 76029614

Opposition No. 91122712

Mark: FIRST NIAGARA BANK'S CUSTOMER CONNECTION LINE

Services:
    IC 036: retail banking services

Filing Date: April 18, 2000

Basis: 1b

Disclaimer: BANK'S and LINE

Application No. 76005479

Opposition No. 91150237

Mark: FIRST NIAGARA E-CD

Services:
    IC 036: banking services, namely, providing electronic banking services to customers via a global computer network

Filing Date: March 20, 2000

Basis: 1b

Disclaimer: E-CD

As grounds for opposition, opposer asserts that applicant's marks, when applied to applicant's services, so resemble opposer's previously used marks FIRST NIAGARA and FIRST NIAGARA INSURANCE BROKERS, in standard character format, and FIRST NIAGARA INSURANCE BROKER'S INC., in the design format shown below, for "insurance brokerage services and other financial services" (notice of opposition, paragraph no. 1) as to be likely to cause confusion, under Section 2(d) of the Trademark Act.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2865169 (Trademark Tr. & App. Bd.), 77 U.S.P.Q.2d 1334
(Cite as: 2005 WL 2865169 (Trademark Tr. & App. Bd.))

# FIRST NIAGARA INSURANCE BROKERS INC.

Applicant, in each of its answers, denies the salient allegations of the claim and asserts as an affirmative defense that "opposer has not 'used' FIRST NIAGARA, FIRST NIAGARA INSURANCE BROKERS, FIRST NIAGARA INSURANCE BROKERS, INC. & design or FIRST NIAGARA INSURANCE BROKERS, INC. in commerce as that term is used in 15 U.S.C. § 1127 or related statutes and common law" (answer, paragraph 10). In Opposition No. 91122072 only, pertaining to the standard character mark FIRST NIAGARA, applicant admitted that "to the extent that opposer uses FIRST NIAGARA as a trademark, FIRST NIAGARA is identical to" the mark FIRST NIAGARA that applicant seeks to register.

## The Record

*3 The record consists of the pleadings; the files of the involved applications; and both parties have made evidence of record by notices of reliance and testimonial depositions, with accompanying exhibits. Both parties filed briefs on the case [FN4] and an oral hearing was held.

## Opposer

Based on the evidence of record, we make the following findings of fact with respect to opposer. Opposer is a Canadian insurance brokerage agency [FN5] with offices, employees and assets in two locations in Ontario, Canada: Niagara Falls and Niagara-on-the-Lake. Opposer adopted its present name in 1984 and has used it continuously from that date as a mark in connection with its insurance services. [FN6] Opposer is licensed in Ontario and acknowledges that "it initiates all of its brokerage services in Canada" (reply brief, p. 8); and that it is not licensed in any state in the United States, any other province in Canada, or any other country to provide insurance brokerage services. Opposer has no property, offices or employees in the United States, nor does it pay any United States or individual state taxes.

Opposer operates a website that includes information about its history, business and employees. An Internet user cannot purchase insurance, make payments on a policy, or access information about a specific account through this website. An Internet user can click on a broker's name on the website to bring up an email screen to send an email to that broker. Opposer's web address is firstniagara.com, whereas applicant's web address is first-niagara.com. Opposer received, at the time of trial, approximately six to ten e-mails per day intended for applicant. [FN7]

Opposer brokers insurance that is actually issued by underwriting companies. The types of insurance opposer brokers include commercial insurance, municipal insurance, athletic bonus insurance, home insurance, boat/yacht insurance, life insurance, broadcast liability insurance, as well as travel, health travel, and travel insurance for individuals living in Canada for travel both within and outside of Canada, including to the United States. [FN8] Processing claims for these policies is a large part of opposer's business. Claims processed may involve incidents occurring in the United States or incidents involving U.S. citizens in Canada.

Most of opposer's clients are Canadian individuals or companies and its policies cover real property located in Canada and personal or commercial property registered or located in Canada or in transit. One of opposer's principals, Michael

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2865169 (Trademark Tr. & App. Bd.), 77 U.S.P.Q.2d 1334
**(Cite as: 2005 WL 2865169 (Trademark Tr. & App. Bd.))**

Maves, stated that opposer also has clients in the United States, United Kingdom,
Azores, Luxembourg, Germany, Japan and Australia; however, there is no evidence as
to whether these clients are Canadians or the nature of the clients' business or
insurance with opposer. Opposer has provided evidence of several situations where
Canadian insurance coverage extends to incidents in, or otherwise involves, the
United States, which are noted below. [FN9] The underwriters used by opposer
include Canadian, U.S., and/or international companies, often through Canadian
branch offices.

   **\*4** Opposer provided testimony and evidence about the insurance policies of
several of its commercial and individual clients. Some of this evidence pertains to
policies issued many years ago. However, the testimony of Bart and Michael Maves
confirms that many of these policies have been renewed continuously to the time of
the respective depositions.

   Opposer works with several U.S. brokerage agencies, which are not licensed in
Canada, that have U.S. clients with property located in Canada. The U.S. broker
contacts opposer, who puts together an insurance proposal from an underwriter and
sends it to the U.S. broker. The U.S. broker will review the policy with its client
and obtain required signatures. It appears from the record that opposer will share
its commission with the U.S. broker, but it is not clear under what circumstances.
To obtain liability insurance for its Canadian travel and tour business clients
that take tourists to the United States, opposer works with a U.S. insurance
brokerage agency that is authorized by the National Tourism Association, an
organization located in the United States, to broker liability policies to its
members.

   Opposer has brokered life insurance policies to a few Canadian residents in
Canada who subsequently moved to various states within the United States and
maintained their Canadian life insurance policies. Opposer has brokered homeowners
insurance for individuals living in various states within the United States, [FN10]
for property located in Ontario, Canada. The individual client files submitted as
exhibits and the testimony of Mr. Michael Maves show that, with respect to a
client's insured Canadian property, in some cases opposer or the client in the
United States directed their correspondence through U.S. brokers in geographic
proximity to the client in the United States; whereas in other cases it appears
that opposer communicated directly with its client in the United States.

   Opposer has brokered "contingency" or "athletic bonus" insurance for Bell Canada,
a Canadian company, in connection with its endorsement contract with a golfer,
Michael Weir, on the PGA Tour, although opposer noted that such "insurance" is more
a financial product than an insurance product. Opposer obtained proposals from
underwriters and financial companies in the United States, Canada and the United
Kingdom, and Bell Canada chose a policy from SCA Promotions, a Texas company.

   Opposer brokers both individual and commercial Canadian auto insurance policies
on vehicles registered in Ontario, Canada; however, such insurance covers incidents
involving the insured vehicles that occur in either Canada or the United States and
may include a rider extending coverage to a client's rental of cars in the United
States and Canada. The Province of Ontario regulates the coverage required by auto
policies. [FN11]

   Similarly, opposer brokers boat/yacht insurance policies. Most of the policies in
the record are riders on homeowner policies relating to Canadian property, while a
few are independent yacht policies. The record includes copies of such policies
issued to clients with addresses in the United States. It is clear that at least
some of the insured boats/yachts are docked or stored in Canada. Coverage extends

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2865169 (Trademark Tr. & App. Bd.), 77 U.S.P.Q.2d 1334
**(Cite as: 2005 WL 2865169 (Trademark Tr. & App. Bd.))**

to incidents involving, in most cases, the boats or yachts on land or in the water
in the territory defined as "inland lakes and streams in North America" (M. Maves
Deposition, p. 391), which is limited by definition in the policies to the United
States and Canada.

**\*5** Opposer brokers approximately 300 commercial liability policies annually,
which usually pertain to buildings and their contents at specified locations.
However, such policies often contain riders covering, for example, goods in
transit. These policies generally extend coverage to incidents arising while the
goods are in transit in the United States. For example, opposer submitted evidence
of a Canadian manufacturer, Automation Devices, for whom it has brokered commercial
general liability and auto liability policies. Automation Devices designs, builds
and installs assembly lines for large factories. Automation Devices has
manufactured and installed equipment for U.S. companies. In such a case, it sends
its own workers to the site in the United States to install the machinery.
Automation Devices' insurance covers liability arising from this work; however,
opposer has had to change underwriters for Automation Devices at least once due to
the underwriter's unwillingness to underwrite Automation Devices' "U.S. exposure."
[FN12] (Opposer's Exhibit 21G.)

Another example wherein opposer has brokered commercial liability insurance that
extends to incidents occurring in the United States involves Stewart Deliveries, a
Canadian delivery service whose trucks and drivers deliver materials and commercial
shipments to southern Ontario and to several states in the United States. Stewart
Deliveries' trucks carry certificates of insurance as required of common carriers
traveling through states in the United States, and, upon a client's request,
opposer has faxed copies of such certificates to, for example, the New Jersey
Bureau of Motor Carriers, for their records. An example of a claim administered by
opposer involved one of Stewart Deliveries' trucks hitting and damaging a barrier
on the New York State Thruway in December 2001. The New York authority presented
its damage claim to Stewart Deliveries, who forwarded it to opposer. Opposer
forwarded the claim to the underwriter, who dealt directly with the New York
authority to settle the claim.

Opposer has brokered a general commercial liability policy, with coverage for
goods shipped in transit and stored off premises in Canada, for Dewgooders
WeatherWear Inc., a Canadian manufacturer of leisure outerwear and waterproof
rainwear. This coverage extends to finished goods in transit to the United States.

Opposer has also brokered a general commercial liability policy for the Niagara
Historical Museum, in Canada, including a fine arts rider to cover a special
exhibit from the United Kingdom and transit of the exhibit to its next stop in
South Carolina.

Opposer has brokered insurance from Canadian underwriters for Canadian
municipalities, including Niagara Falls and Niagara-on-the-Lake, both located in
Ontario. This insurance includes coverage for injuries and other damage incurred by
tourists, including those from the United States, while visiting these
municipalities.

The Niagara Falls Bridge Commission ("NFBC") [FN13] owns and operates three
bridges between the United States and Canada. These bridges also have businesses
located on their premises. Opposer has issued commercial liability insurance to
businesses leasing this space. Additionally, opposer has brokered a general
commercial liability and auto liability policy for the Indian Defense League of
America, an organization with a Canadian address, in connection with an annual
parade starting on one of the bridges operated by the NFBC between the United

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2865169 (Trademark Tr. & App. Bd.), 77 U.S.P.Q.2d 1334
**(Cite as: 2005 WL 2865169 (Trademark Tr. & App. Bd.))**

States and Canada. The parade begins in the middle of the bridge and continues into
Canada, ending at a park.

**\*6** Wayne Arthur "Bart" Maves, opposer's founder, stated that in 1973 opposer's
gross premiums were approximately $728,000; that today its gross premiums are
approximately $7,250,000; and that opposer's annual advertising budget is
approximately $30,000, all in Canadian dollars. Opposer advertises its services by
word-of-mouth; in Internet phone directories; in several local Ontario papers in
Niagara and Niagara-on-the-Lake; by advertising on a local Ontario radio station
that may be heard in the nearby United States; by sponsoring local Ontario sports
teams, some of whom play games in the United States; and by distributing, in
opposer's local Ontario area, various promotional items with opposer's marks upon
them.

Applicant

Based on the evidence of record, we make the following findings of fact with
respect to applicant. Applicant's business includes banking, investment and related
services and, of most relevance herein, applicant is an insurance brokerage agency
licensed to do business as a resident in New York State and as a non-resident in
forty-five other states. Applicant has never had offices in Canada. Applicant's
insurance business is located in Northpointe, New York; and applicant, in the past,
has had offices in Buffalo and Niagara Falls, New York, as well as several other
towns in western New York State. In January 1999, applicant was acquired by
Lockport Savings Bank; in November 2002, applicant changed its name from Warren
Hoffman Associates, Inc. to First Niagara Risk Management, Inc., for which it
obtained approval from the New York Department of Insurance.

Applicant is licensed by the New York Department of Insurance, a state government
agency, to offer insurance brokerage services in New York. The New York Department
of Insurance specifies the types of insurance applicant is authorized to sell;
requires annual license renewal for a fee; and requires continuing education of
license holders. Applicant does not presently hold a non-resident license to sell
insurance in Ontario, Canada.

Applicant offers its insurance services primarily in western New York state and
the types of insurance it brokers include the following: commercial property and
casualty, surety, employee benefits, life, accident and health (personal and
commercial), personal property and casualty, including homeowners, auto, personal
umbrella, watercraft, and other recreational vehicles, and annuities. Applicant
admits that it has sold yacht insurance for yachts registered in New York or
another state, but not for yachts registered in Canada, and that the yachts it
insures may be docked in either the United States or Canada. Additionally,
applicant admits that it has sold life and personal property insurance policies to
individuals who are residents, at the time of the policy sale, of New York or
another state, but not to individuals who are residents only of Canada.

Applicant has sold real property insurance to residents of Canada for property
located in New York or another state, but not for property located in Canada.
(Response to Opposer's First Request for Admissions.) If a New York resident
policyholder changes his or her residence to Canada, the policy, for example, life
insurance, remains valid and applicant communicates with the policyholder in
Canada. (Applicant's Response to Opposer's First Set of Interrogatories.) Applicant
admits that it offers these services to persons resident outside of New York or in
Canada, but only in cooperation with insurance agents from the respective state or
Canada. Applicant also offers financial services.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2865169 (Trademark Tr. & App. Bd.), 77 U.S.P.Q.2d 1334
**(Cite as: 2005 WL 2865169 (Trademark Tr. & App. Bd.))**

*7 When applicant's non-commercial U.S. customers want insurance for a Canadian
risk, such as a property located in Canada, applicant refers them to a Canadian
broker, who writes the policy. Applicant does not write such policies because there
would be a premium tax to the customer if the policy is not written by a Canadian
insurance agency and, further, applicant is not expert in Canadian insurance.

Applicant's witness, John Hoffman, one of applicant's principals, stated that
while it is rare, if circumstances arose whereby a Canadian citizen sought to
purchase a life insurance policy from applicant, the customer would be required to,
at least, apply for and accept delivery of the policy in New York state and pay the
premium in New York State in U.S. funds.

Mr. Hoffman confirmed that its various individual personal, as well as corporate
commercial, insurance policies cover incidents occurring in either the United
States or Canada. In the few instances where applicant has insured its U.S.
commercial clients for projects or manufacturing that have taken place in Canada,
applicant has used a Canadian broker and a Canadian underwriter, and has not
accepted a commission for the policy. Applicant could only accept such a commission
if it had a non-resident license in Ontario, which it has not had for many years.

Applicant belongs to a professional insurance organization, Intersure, with
approximately thirty members in the United States, Canada and the United Kingdom,
each representing a specific geographic area. The organization provides
professional education and the members avail themselves of the assistance and
advice of other members regarding insurance practice in different geographic areas.

Both applicant's Mr. Hoffman and opposer's Mr. Bart Maves acknowledge that they
met before this proceeding on several occasions as part of various groups at golf
clubs; and that they each knew the other was involved in the insurance business,
although Mr. Hoffman stated that he did not previously know the name of Mr. Maves'
business. Applicant admitted, in its Response to Opposer's First Request for
Admissions, that it knew of opposer's Internet domain name, firstniagara.com, at
the time it adopted its domain name, first-niagara.com. The record shows that, from
the time applicant changed its name to First Niagara, opposer began receiving
emails that were intended for applicant; although Mr. Hoffman stated that applicant
never received emails intended for opposer. Applicant contacted opposer seeking to
purchase opposer's domain name, but opposer declined to sell it.

Opposer acknowledges that it advertises in printed periodicals and on radio
stations in Canada; applicant acknowledges that it advertises in the same media in
New York; and both parties acknowledge that, given their proximity to the United
States/Canadian border, and their proximity to each other, each of their respective
advertising likely spills over into the other's country and business area.

New York State Insurance Law

*8 Opposer offered the trial deposition of Michael Giordano, an attorney at the
law firm of LeBoeuf Lamb in New York City, as expert testimony on the subject of
insurance regulatory law. [FN14] Mr. Giordano stated that any person or entity
acting as an insurance broker in New York State must be licensed by the New York
Department of Insurance. Mr. Giordano stated that, based on this record and his
familiarity with New York state insurance law, opposer is not licensed as either a
resident or non-resident broker under New York insurance law; opposer's activities
are not in violation of New York insurance law; and opposer has not acted as an
insurance broker in New York.

The excerpts submitted by applicant from the laws of the State of New York,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2865169 (Trademark Tr. & App. Bd.), 77 U.S.P.Q.2d 1334
**(Cite as: 2005 WL 2865169 (Trademark Tr. & App. Bd.))**

Chapter 28, Insurance Law, make the following points clear, broadly speaking:
  • Insurance brokerage services of the type rendered by the parties in this case would be considered "doing an insurance business" (Article 11, Sec. 1101(b)(1));
  • "Doing an insurance business" in the state of New York requires licensure by the state insurance licensing authority (id., Sec. 1102(a));
  • If, at the time an insurance policy properly issued outside the state, such policy covered subjects of insurance or risk not resident or located in the state, then subsequent "acts or transactions [regarding such policies] ... shall not constitute doing an insurance business in this state" (i.e., the broker's actions shall not require licensure) (id., Sec. 1101(b)(2)(D)); and
  • "Transactions with respect to policies of insurance on risks located or resident within or without this state ... which policies are principally negotiated, issued and delivered without this state in a jurisdiction in which the insurer is authorized to do an insurance business" shall not constitute doing an insurance business in the state (id., Sec. 1101(b)(2)(E)).

   The law includes specific prohibitions against doing an insurance business in the state by a person or entity not licensed by New York state (including persons or businesses so licensed in another state or country but not in New York); and provides specific jurisdiction in New York state with provisions for service of process in actions against unlicensed (in New York) persons or entities for claims involving business conducted within the state. For licensure, the law requires approval by the New York Department of Insurance of the name under which a licensed brokerage will do business. The law prohibits the licensure of any broker "proposing to do business under a name identical with, or so similar to as to be likely to deceive or mislead the public, the name of any insurer then licensed or authorized to do any kind of insurance business within this state, or of any proposed domestic insurance corporation" (id., Sec. 1102(g)(1)).

Analysis

   **\*9** Opposer, as plaintiff in this proceeding, has the burden of establishing by a preponderance of the evidence that it is the owner of the pleaded marks and that it has priority such that it can prevail on its likelihood of confusion claim. Sanyo Watch Co. v. Sanyo Electric Co., Ltd., 691 F.2d 1019, 215 USPQ 833, 834 (Fed. Cir. 1982). That is, likelihood of confusion cannot be recognized where one claimed to be aggrieved by that confusion does not have a right superior to the opponent's right. Otto Roth & Co., Inc. v. Universal Foods Corp., 640 F.2d 1317, 209 USPQ 40 (CCPA 1981); and BellSouth Corp. v. Planum Technology Corp., 14 USPQ2d 1555 (TTAB 1988).

   Opposer did not plead or establish ownership of a federal trademark registration for its asserted marks. Applicant contends that opposer, a Canadian insurance brokerage company, has not established any use of its mark in connection with services rendered in commerce lawfully regulated by Congress, as required under Section 45 of the Trademark Act, 15 U.S.C. § 1127. Applicant argues that opposer has no offices in the United States; that it has no state licenses to conduct insurance brokerage services in any state in the United States; and that the facts are insufficient to support a conclusion that opposer has used its marks in connection with its services in commerce in or with the United States.

   Opposer contends that its services "carried out within the various states and between the United States and Canada, by the mails, telephone, fax and internet, are in both interstate commerce and foreign commerce with the United States [and] are thus rendered in commerce that Congress may regulate" (brief, p. 3). Opposer argues that the insurance policies that it places, the negotiating and settling of claims related to covered activities, and engaging the services of U.S. brokers

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2865169 (Trademark Tr. & App. Bd.), 77 U.S.P.Q.2d 1334
**(Cite as: 2005 WL 2865169 (Trademark Tr. & App. Bd.))**

"all profoundly affect commerce both within the United States as well as commerce
between Canada and the United States" (brief, p. 32).

    Clearly, opposer's claim of prior use can succeed only if it has provduse of its
marks in connection with services rendered in commerce lawfully regulated by
Congress, as required under Section 45 of the Trademark Act, 15 U.S.C. § 1127.
[FN15]

    We begin by noting that there is nothing in this record upon which we can base a
conclusion that, as applicant contends, opposer has violated New York state law
and, therefore, that any services opposer may have rendered in commerce were
"unlawful." Moreover, the Board will not delve further into the insurance law and
relevant precedent of New York State to determine whether, as applicant contends,
any actions by opposer violate such provisions of law so as to constitute "unlawful
commerce." Any specific concerns applicant has in this regard should be brought
before the proper New York State authority.

    *10 There is no evidence or quoted provision of law in this record that
contradicts the aforementioned conclusions stated by opposer's insurance law
expert, Mr. Giordano, which applicant does not contest. Therefore, we begin our
analysis with the findings that opposer is not licensed as either a resident or
non-resident broker under New York insurance law or any other state law (which
opposer acknowledges), and opposer has not acted as an insurance broker in New York
or in any other state in the United States. However, we do not, as applicant would
urge us to do, end our inquiry here. State insurance law is relevant to the
question of opposer's rendering of services in commerce, but it is far from
determinative of federal trademark rights. We must consider all of the relevant
facts and law to determine whether opposer has established that it renders
insurance brokerage services under its pleaded marks in commerce regulable by
Congress.

    Section 45 of the Trademark Act (15 U.S.C. § 1127) includes the following
definitions of "commerce" and "use in commerce":
    Commerce. The word "commerce" means all commerce which may lawfully be
regulated by Congress.
    Use in commerce. The term "use in commerce" means the bona fide use of a mark
in the ordinary course of trade, and not made merely to reserve a right in a mark.
For purposes of this Act, a mark shall be deemed to be in use in commerce--
    ...
    (2) on services when it is used or displayed in the sale or advertising of
services and the services are rendered in commerce, or the services are rendered in
more than one State or in the United States and a foreign country and the person
rendering the services is engaged in commerce in connection with the services.

    "Commerce" under the Trademark Act is coterminous with that commerce that
Congress may regulate under the Commerce Clause of the United States Constitution.
[FN16] International Bancorp, L.L.C. v. Societe des Bains de Met et du Cercie des
Etrangers Monaco, 329 F.3d 359, 66 USPQ2d 1705 (4th Cir. 2003). See also, United We
Stand America, Inc. v. United We Stand, America, NY, Inc., 128 F.3d 86, 92-93, 44
USPQ2d 1351 (2nd Cir. 1997); and Planetary Motion v. Techsplosion, 261 F.3d 1188,
1194, 59 USPQ2d 1894 (11th Cir. 2001). The case before us is analogous to the case
of Buti Fashion World Company v. Impressa Perosa S.R.L., 139 F.3d 98, 45 USPQ2d
1985 (2nd Cir. 1998), wherein the Court stated the following about the scope of
"commerce" as defined by the Trademark Act:
    In the trademark context, the limits of Congress's Commerce Clause authority
are manifested by the cases that define the extraterritorial reach of the Lanham
Act. ... [W]e are concerned here not with the extraterritorial force of our

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2865169 (Trademark Tr. & App. Bd.), 77 U.S.P.Q.2d 1334
(Cite as: 2005 WL 2865169 (Trademark Tr. & App. Bd.))

trademark laws to regulate or redress the conduct of a foreign citizen in a foreign
land, but with the ability of that foreign citizen to gain the protection of our
trademark laws, and the degree of interaction with our nation's commerce that is
required of him to receive that protection.

   *11 It is well established that prior use of a mark in a foreign country does not
entitle its owner to claim exclusive rights in the United States as against one who
used a similar mark in the United States prior to entry of the foreigner into the
United States market. Person's Co. Ltd. v. Christman, 900 F.2d 1565, 14 USPQ2d
1477, 1480 (Fed. Cir. 1990). Thus, opposer's insurance brokerage services rendered
under its mark in Canada are clearly insufficient to establish use of the mark in
connection with services rendered in commerce under the Trademark Act.

   Similarly, advertising and promotion of a mark in connection with goods or
services marketed in a foreign country (whether the advertising occurs inside or
outside the United States) creates no priority rights in said mark in the United
States as against one who, in good faith, has adopted the same or similar mark for
the same or similar goods or services in the United States prior to the foreigner's
first use of the mark on goods or services sold and/or offered in the United
States, at least unless it can be shown that the foreign party's mark was, at the
time of the adoption and first use of a similar mark by the first user in the
United States, a "famous" mark. Mother's Restaurants Inc. v. Mother's Other
Kitchen, Inc., 218 USPQ 1046, 1048 (TTAB 1983). See also Linville v. Rivard, 41
USPQ2d 1731 (TTAB 1996), aff'd, 133 F.3d 1446, 45 USPQ2d 1374 (Fed. Cir. 1998);
Buti Fashion World Company v. Impressa Perosa S.R.L., supra; All English Lawn
Tennis Club (Wimbledon) Ltd. v. Creations Aromatiques, Inc., 220 USPQ 1069 (TTAB
1983); and Vaudable v. Montmartre, Inc., 123 USPQ 357 (NY Sup. Ct. 1959).

   Opposer does not rely solely on advertising and promotion in the United States.
Further, opposer's advertising is clearly directed to Canadian purchasers. Any
spillover advertising is minimal and insufficient to establish that opposer renders
its services in commerce under its marks. To the extent opposer is arguing that
applicant acted in bad faith in adopting its mark, applicant's prior knowledge of
the existence of opposer's marks is not, in itself, sufficient to constitute bad
faith. See Action Temporary Services Inc. v. Labor Force Inc., 870 F.2d 1563, 10
USPQ2d 1307 (Fed. Cir. 1989). Knowledge of a foreign use does not preclude good
faith adoption and use in the United States. Person's Co. Ltd. v. Christman, supra.
A finding of bad faith is warranted where (1) the foreign mark is famous in the
United States or (2) the use is a nominal one made solely to block the prior
foreign user's planned expansion into the United States. There is no evidence that
opposer's mark is known in the United States by more than a few brokers and a
handful of former Ontario residents and current Ontario landowners. Moreover, any
such knowledge is incidental to opposer's rendering of its Canadian-based insurance
brokerage services.

   *12 There is also no evidence that applicant intentionally sought to trade on
opposer's good will or reputation. While there is evidence that the parties'
principals were acquainted through golf outings and tournaments and Mr. Bart Maves
and Mr. Hoffman each knew the other was in the insurance business, there is no
evidence to belie Mr. Hoffman's statement that he did not know the name of Mr.
Maves' business. Applicant learned of opposer's Internet domain name registration
when it adopted its mark and sought to register it as a domain name and, thus,
presumably learned the name of opposer's business and the nature of its services at
that time. But there is no evidence in the record that applicant had any reason to
believe that opposer used its name as a mark in connection with insurance brokerage
services rendered in commerce in or with the United States. None of the
circumstances for establishing bad faith adoption by applicant is present based on

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2865169 (Trademark Tr. & App. Bd.), 77 U.S.P.Q.2d 1334
**(Cite as: 2005 WL 2865169 (Trademark Tr. & App. Bd.))**

the facts in this case.

   We consider now whether opposer's actions, as described herein and taken as a whole, constitute use of its marks in connection with insurance brokerage services rendered in commerce, in this case either interstate commerce or foreign commerce between the United States and Canada.

   Because opposer cites the Supreme Court decision of United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533 (1944), in support of its statement that "the insurance business is one that squarely falls within the Commerce Clause" (brief, p. 47), we begin by noting that Congressional passage of the McCarran-Ferguson Act (15 U.S.C. § § 1011 to 1015) was prompted by the South-Eastern Underwriters decision. While not disputing Congress' inherent power under the Commerce Clause to regulate the business of insurance, the Act expressly grants to the states the power to regulate the insurance industry. [FN17] See Owens v. Aetna Life & Casualty Co., 654 F.2d 218, 224- 226 (3rd Cir. 1981).

   In Aetna, supra, the Court specified certain activities that were to be considered "the business of insurance" and, thus, subject to state regulation, including "authorizing agents to solicit individual or group policies" and "accepting or rejecting coverages tendered by brokers." See also SEC v. Variable Annuity Life Insurance Co., 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959); Anglin v. Blue Shield of Virginia, 693 F.2d 315 (4th Cir. 1982); and 43 Am Jur 2d § 30.

   There is no precedent that concludes that the McCarran-Ferguson Act limits, or otherwise affects, the applicability of the federal Trademark Act to the business of insurance; or that it prohibits entities properly engaged in the business of insurance under the laws of the appropriate state or states from obtaining federal trademark protection or availing themselves of the rights and remedies provided under the federal Trademark Act. It is, however, relevant, given the express power of the States to regulate the business of insurance, that the cases interpreting the McCarran-Ferguson Act specifically include brokerage-type services as part of the "business of insurance" covered by that Act and reserved to the states by law. Consistent therewith, we note, for example, New York state insurance law, which reiterates that brokerage services are part of the "business of insurance."

   **\*13** As previously noted, to render insurance brokerage services in the United States, one must be licensed in the state in which such services are to be rendered. As opposer admits, it has no state license to conduct insurance brokerage services in any state in the United States, nor has opposer provided evidence that it has rendered brokerage services in the "business of insurance" under the laws of any state in the United States. [FN18] Rather, opposer is licensed in Ontario, Canada, conducts its insurance brokerage services under its marks in Ontario, and its services are regulated by Ontario law. The nexus of its services is Ontario and the activities opposer undertakes in communicating with U.S. brokers and clients are simply a necessary part of its Canadian business.

   The activities with any connection to the United States that opposer has established in this record are de minimis and merely incidental to opposer's rendering of its insurance brokerage services in Canada. Not only are the insurance policies or riders brokered by opposer that extend certain coverages to the United States or U.S. citizens in Canada merely part and parcel of opposer's rendering of its services in Canada, but these policies and riders reflect the rights and liabilities of the underwriter, not those of the broker. Such activities do not constitute rendering of insurance brokerage services in either interstate or foreign commerce. Based on the facts of this case and the relevant trademark law and precedent, we find that opposer has not used its marks in connection with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2865169 (Trademark Tr. & App. Bd.), 77 U.S.P.Q.2d 1334
**(Cite as: 2005 WL 2865169 (Trademark Tr. & App. Bd.))**

insurance brokerage services rendered in commerce regulable by Congress. It would be antithetical to common sense to permit opposer, who is not engaged in any brokerage services subject to U.S. state regulation, to rely upon the "use in commerce" provisions of the Trademark Act to establish priority over a New York state-licensed insurance brokerage business while itself avoiding the same state laws requiring, inter alia, licensure, name approval, and payment of taxes. Opposer cannot have it both ways.

Opposer draws distinctions between interstate commerce and foreign commerce, and which particular "categories" of commerce pertain to its activities. However, we need not address each of opposer's points in this regard. We have looked at the facts of this case and found that none of opposer's incidental activities in evidence herein constitutes a brokerage service rendered in any type of commerce regulable by Congress.

Furthermore, the trademark cases cited by opposer in support of its position are distinguishable on their facts. [FN19] For example, in the case of <u>Koffler Stores, Ltd. v. Shoppers Drug Mart, Inc., 434 F.Supp. 697, 193 USPQ 165 (E.D. Mich. 1976)</u>, plaintiff, a Canadian corporation, adopted its mark in Ontario, Canada in 1962 and was engaged in the retail drug business in Windsor, Ontario; obtained a Canadian trademark registration in 1969; obtained a U.S. trademark registration in February 1974; and opened a store in Florida in 1974, followed by other stores in the United States. Defendant's first use of the same mark did not occur until April or May, 1974, which was subsequent to the United States registration and use of Plaintiff's trademark. The court also concluded that defendant's adoption of the identical mark was not innocent, as plaintiff's advertising was extensive, circulated throughout the eastern portion of Michigan, as well as throughout other states adjacent to the Canadian-American border, and a significant amount of plaintiff's advertising originated in the United States. These facts of prior use and registration and extensive U.S. advertising differ significantly from the facts herein. Also, because of the very nature of insurance brokerage services, it is unlikely that a U.S. resident hearing advertising for opposer's services that spills over into, for example, New York state would leave either the state or the country to obtain insurance for property in, or another insurable risk whose nexus is, New York.

**\*14** The plaintiff in the case of <u>Morningside Group Ltd. v. Morningside Capital Group L.L.C., 182 F.3d 133, 51 USPQ2d 1183</u> (2nd Cir. 1999), was a Hong Kong-based company with offices and licensees located in the United States, and engaged in various financial activities in the United States through its offices and licensees. The issue reviewed by the Second Circuit was whether plaintiff provided a service and whether a mark had been used to identify a particular service, which the Second Circuit answered in the affirmative. The question before us is not whether opposer renders a service in connection with its marks, but whether such services are rendered in commerce.

Opposer cited the case of International Bancorp, L.L.C. v. Societe des Bains de Met et du Cercie des Etrangers Monaco, supra, for the principle that services rendered in a foreign country (in this case Monaco) to United States citizens were rendered in foreign commerce which satisfies the use in commerce requirement in the Trademark Act. However, the Court in <u>International Bancorp stated (66 USPQ2d at 1713)</u> that "the use of an unregistered mark in foreign trade does not in any way assure its owner that the mark will merit [Trademark] Act protection; it only makes such protection possible. For an unregistered mark that is used in foreign trade to merit [Trademark] Act protection, that mark must be distinctive among United States consumers." Thus, it was not insignificant to the Court that defendant had operated a casino in Monaco under the "Casino de Monte Carlo" trademark since 1863; that the casino is well known, if not famous worldwide; and that, for many years, defendant

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2865169 (Trademark Tr. & App. Bd.), 77 U.S.P.Q.2d 1334
**(Cite as: 2005 WL 2865169 (Trademark Tr. & App. Bd.))**

had maintained an office in New York with a $1 million promotional budget. The
Court stated (66 USPQ2d at 1717) that "where the mark is both used in advertising
and displays in the United States and attached to services rendered in qualifying
commerce overseas defendant has met the use in commerce requirement of the
Trademark Act" and went on to state (66 USPQ2d at 1721 - 1722) the following:

The proper inquiry in such circumstances is to evaluate first whether the
commerce to which both parties claim their mark is attached may be regulated by
Congress, and then to evaluate at what point in time the mark owners began to use
or display the mark in the advertising and sale of those qualifying services to the
qualifying consumers. ... Indeed, that it is not enough for a mark owner to engage
in qualifying commerce to create rights in his mark, and that it is not enough for
a mark owner to use or display the mark in the advertising or sale of services to
create rights in his mark, is critical." (Emphasis in original.)

*15 When we apply the principles enunciated in International Bancorp v. Monaco to
the facts in the case before us, we find, as previously stated, that the nexus of
opposer's business is Canada; its activities in the United States are minimal and
incidental to its Canadian business; its advertising is directed to Canadian
purchasers; and there is only minimal spillover into New York of its advertising on
a single local radio station. These facts are insufficient to reach the conclusion
that services under the marks are rendered in foreign commerce.

Opposer also relies on Larry Harmon Pictures Corp. v. The Williams Restaurant
Corp., 929 F.2d 662, 18 USPQ2d 1292 (Fed. Cir. 1991), and Penta Hotels, Ltd. v.
Penta Tours, 9 USPQ2d 1081 (D. Conn. 1988). However, these cases involved services
that were actually rendered in the United States, i.e., a restaurant located in
Tennessee in the first case, and, in the second case, a hotel in New York that
attracted interstate travelers and also engaged in extensive advertising and had a
New York office that booked reservations. Similarly, the cases of In re Gastown,
Inc., 326 F.2d 780, 140 USPQ 216 (1964), and In re Silenus Wines, Inc., 557 F.2d
806, 194 USPQ 26 (CCPA 1977), pertain to intrastate activities that were found to
have a direct affect on, respectively, interstate commerce and foreign commerce,
which is not the situation herein.

In conclusion, we find that opposer has not established use of its pleaded marks
on insurance brokerage services rendered in a type of commerce regulable by
Congress. Therefore, opposer cannot establish its priority and cannot prevail on
its claim of likelihood of confusion.

Decision: The oppositions are each dismissed.

FN1. The oral hearing, which was held in New York City during a Practising Law
Institute program, was held before Judges Sams and Walters, with the oral consent
of the parties' attorneys. An audiotape of the hearing was available to the third
panel member herein, Judge Walsh.

FN2. The heading has been changed to reflect applicant's change of name from
**Niagara** Bancorp, Inc. The name change was executed on May 12, 2000, and was
recorded at the USPTO on July 24, 2000.

FN3. These six oppositions were consolidated by the Board's order of June 12, 2002,
addressing the parties' stipulated motion to consolidate, filed March 7, 2002.

FN4. Both parties filed consented motions to submit briefs that exceeded the page
limits set forth in 37 CFR § 2.128(b), arguing that it is warranted by the size of
the record and the number of proceedings consolidated. These motions were granted
by the Board due to the compelling circumstances of this consolidated proceeding.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2865169 (Trademark Tr. & App. Bd.), 77 U.S.P.Q.2d 1334
(Cite as: 2005 WL 2865169 (Trademark Tr. & App. Bd.))

We hasten to point out that the instances in which the Board will grant such
motions, whether or not consented to by the other party, are extremely limited.

FN5. To a lesser extent, opposer also offers financial services in the form of
insurance premium payment plans, segregated funds and annuities.

FN6. In 1973, one of opposer's present principals, Mr. Wayne Arthur "Bart" Maves,
purchased the business, operating since 1886, and, as noted, changed the name in
1984 to First Niagara Insurance Brokers Inc.

FN7. Applicant contacted opposer soon after opposer obtained its web address in
2000 and several times thereafter in an attempt to purchase the web address from
opposer.

FN8. By Canadian law or regulation, opposer's health travel insurance may be issued
only to Canadian residents who are covered by Canadian provincial medical
insurance; further, to obtain an annual travel health policy, the insured must
reside in Canada for a prescribed period of time. Opposer issues between thirty and
seventy travel health policies per year.

FN9. Opposer provided specific evidence about Mr. Bart Maves' involvement in a
fraternal organization, the Kentucky Colonels, with headquarters in Kentucky.
Clearly, this is irrelevant to opposer's business except to the extent that opposer
issued travel or other liability insurance to the local Ontario chapter of this
organization. Also, evidence of Mr. Bart Maves' personal involvement in and
sponsorship of a golf tournament in the United States is not relevant to the issue
of whether opposer's services are rendered in commerce.

FN10. Several of the individuals so insured originally lived at the insured
Canadian property addresses when they obtained the insurance and subsequently moved
to the United States, but retained the Canadian properties for rental or vacation
use.

FN11. If, in addition to commercial vehicle coverage for Ontario, a business will
be transporting goods into the United States, Mr. Michael Maves stated that opposer
will broker a second policy through a U.S. underwriter for the travel in the United
States.

FN12. Mr. Michael Maves stated that this was the result of post-9/11/01 changes and
the new underwriter is Cross Border Underwriting Services in Canada.

FN13. The Niagara Falls Bridge Commission was created in 1938 under a joint
resolution of the U.S. Congress, with corresponding legislation in Canada. As
amended, the U.S. law authorizes the Niagara Falls Bridge Commission to build,
maintain and operate bridges between the United States and Canada, with each bridge
being in part in the United States and in part in Canada; and to charge tolls and
issue bonds in connection therewith. The law provides that, for the purpose of
exemption from taxes, "[t]he bridge constructed under the authority of this joint
resolution shall be deemed to be an instrumentality for international commerce
authorized by the Government of the United States" (Section 4). A recent amendment
to Section 6 of the Joint Resolution states: "(c) TREATMENT OF COMMISSION - the
Commission shall be deemed for purposes of all Federal law to be a public agency or
public authority of the State of New York, notwithstanding any other provision of
law." The Commission consists of four members appointed by the Governor of New York
and four members appointed by the Canadian government or the government of Ontario.

FN14. While applicant's attorney objected to Mr. Giordano's being accepted as an

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2865169 (Trademark Tr. & App. Bd.), 77 U.S.P.Q.2d 1334
**(Cite as: 2005 WL 2865169 (Trademark Tr. & App. Bd.))**

expert witness during the deposition, the objection was not renewed in applicant's brief. In fact, in its brief applicant referred to Mr. Giordano as "opposer's own insurance law expert." Therefore, any objection is deemed to have been waived.

FN15. An opposer claiming priority under Section 2(d) may rely on use that is strictly intrastate and not regulable by Congress, but opposer here is not relying on intrastate use.

FN16. "The Congress shall have Power ... to regulate Commerce with foreign nations, and among the several States, and with the Indian Tribes[.]" U.S. Const. art. I, § 8, cl. 3.

FN17. Section 2(b) of the McCarran-Ferguson Act provides:
   No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax on that business, unless such Act specifically relates to the business of insurance: Provided, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

FN18. We are not suggesting that failure to comply with state law would necessarily negate trademark rights which were otherwise properly established.

FN19. Particularly in its reply brief, opposer cited a number of Supreme Court decisions addressing the Commerce Clause of the U.S. Constitution. These cases, however, do not support opposer's conclusion that opposer's activities in this case are rendered in "commerce."

2005 WL 2865169 (Trademark Tr. & App. Bd.), 77 U.S.P.Q.2d 1334

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT C**

Westlaw.

218 U.S.P.Q. 1046
1983 WL 51992 (Trademark Tr. & App. Bd.), 218 U.S.P.Q. 1046
**(Cite as: 218 U.S.P.Q. 1046)**

▷

Mother's Restaurants Incorporated
v.
Mother's Other Kitchen, Inc.

Patent and Trademark Office Trademark Trial and
Appeal Board

Decided June 2, 1983
United States Patents Quarterly Headnotes

**TRADEMARKS**
**[1] Acquisition of marks -- Character and extent
of use -- In general (§ 67.0731)**
Prior use and advertising of mark in connection with
goods or services marketed in foreign country,
whether that advertising occurs inside or outside
U.S., creates no priority rights in such mark in U.S.
as against one who, in good faith, has adopted same
or similar mark for same or similar goods or services
in U.S. prior to foreigner's first use of mark on goods
or services sold and/or offered in U.S., at least unless
it can be shown that foreign party's mark was, at time
of adoption and first use of similar mark by first user
in U.S., "famous" mark within meaning of Vaudable
v. Montmartre, Inc., 123 USPQ 357.

**TRADEMARKS**
**[2] Marks and names subject to ownership -- In
general (§ 67.501)**
Fact that word is commonly used word in everyday
language is not determinative of whether term can
become trademark or whether such trademark is
strong or weak.

**TRADEMARKS**
**[3] Opposition -- Pleading and practice (§ 67.589)**
Apparent admission against interest that represents
position inconsistent with position now taken in
opposition is not conclusive on question of whether
mark is strong or weak.

**TRADEMARKS**
**[4] Identity and similarity -- How determined --
Side by side comparison (§ 67.4073)**
Side-by-side comparison is not proper test in
evaluating question of likelihood of confusion since

that is not the way customers will come in contact
with mark in marketplace; rather, one must look to
general overall commercial impression created in
mind of consumer whose memory of mark is
imperfect.

**TRADEMARKS**
**[5] Identity and similarity -- Words -- Similar (§
67.4117)**
Use of "Mother's Other Kitchen" and of "Mother's
Pizza Parlour," for restaurant services, is likely to
cause confusion.

**\*1046** Trademark opposition No. 61,624, by
Mother's Restaurants Incorporated, against Mother's
Other Kitchen, Inc., application, Serial No. 103,201,
filed Oct. 14, 1976. Opposition sustained; Allen,
Member, concurring in part and dissenting in part
with opinion.

Gottlieb, Rackman & Reisman, P.C., New York,
N.Y., for Mother's Restaurants Incorporated.

James T. Fitzgibbon and Angelo J. Bufalina, both of
Chicago, Ill., for Mother's Other Kitchen, Inc.

**\*1047** Before Allen, Simms, and Krugman,
Members.

Krugman, Member.

An application has been filed by Mother's Other
Kitchen, Inc. to register "MOTHER'S OTHER
KITCHEN" for carry out restaurant services. [FN1]
The word "KITCHEN" has been disclaimed apart
from the mark as shown.

Registration has been opposed by Mother's
Restaurants, Incorporated. As grounds for
opposition, opposer asserts that applicant's mark so
resembles opposer's previously registered mark
"MOTHER'S PIZZA PARLOUR" for restaurant
services [FN2] (the term PIZZA PARLOUR being
disclaimed apart from the mark) and previously used
marks "MOTHER'S" and "MOTHER'S PIZZA
PARLOUR & SPAGHETTI HOUSE" both for
restaurant services, as to be likely, when applied to
applicant's services, to cause confusion, mistake or to
deceive.

COPR. © 2006 The Bureau of National Affairs, Inc.

218 U.S.P.Q. 1046                                                                 Page 2
1983 WL 51992 (Trademark Tr. & App. Bd.), 218 U.S.P.Q. 1046
**(Cite as: 218 U.S.P.Q. 1046)**

Applicant, in its answer to the opposition, has denied the salient allegations therein.

The record consists of the pleadings, the file of applicant's application, opposer's pleaded registration made of record pursuant to Trademark Rule 2.122(b), [FN3] portions of printed publications relied on by opposer and testimony taken by opposer. Both parties have filed briefs on the case and opposer has filed a reply brief. Both parties were represented at oral hearing.

Opposer's priority in the mark "MOTHER'S PIZZA PARLOUR" for restaurant services has been established by the introduction into evidence of opposer's pleaded registration in connection with the testimony of Mr. Grey Sisson, president and chairman of the board of opposer corporation. In this regard, applicant has raised the question that opposer should not be allowed to rely on its trademark registration and that applicant should be declared the prior user for the reason that the application that matured into the registration involved herein was statutorily defective; that the Office improperly and erroneously allowed said registration to issue; and that if the Office had followed proper procedures, opposer's registration would have issued subsequent to the filing date of applicant's application.

Applicant has raised the issue of the propriety of the issuance of opposer's pleaded registration in its brief. This is the first time that this issue has been raised and under the circumstances, this issue is considered to be raised in an untimely manner. This new issue was neither pleaded nor proved and the registration file of opposer's pleaded registration was not introduced into evidence either pursuant to a notice of reliance under Trademark Rule 2.122(c) or in connection with the testimony of a witness. Thus, it is the Board's view that the propriety of the issuance of the registration is not an issue that was tried by either the express or implied consent of the parties in accordance with Rule 15(b) FRCP. Moreover, even if applicant had pleaded and sought to prove the new allegations raised in its brief, opposer has correctly pointed out in its reply brief that it is well settled that applicant may not attack the validity of opposer's pleaded registration in the absence of a counterclaim to cancel said registration. Knorr-Nahrmittel Aktiengesellschaft v. Holland International, Inc. 206 USPQ 827 (TTAB 1980). Accordingly, the Board may not give any consideration to applicant's arguments relative to the issue of the propriety of the issuance of opposer's pleaded registration.

[1] With respect to the question of opposer's asserted priority in the pleaded marks "MOTHERS'S" and "MOTHER'S PIZZA PARLOUR & SPAGHETTI HOUSE", opposer has shown by way of testimony that its predecessor in interest opened a restaurant under the name "MOTHER'S PIZZA PARLOUR" in Hamilton, Ontario, Canada on December 1, 1970; that some 55 additional restaurants under the same name subsequently opened up in Canada and the United States; that the first restaurant opened in the United States was in November 1977 in Columbus, Ohio; that opposer since 1971 has used its marks "MOTHER'S'S" and "MOTHER'S PIZZA PARLOUR & SPAGHETTI HOUSE" in radio advertisements; that many of the radio advertisements used during the period 1971-1977 were broadcast on Canadian radio stations having radio signals reaching the United States, specifically, parts of New York and Michigan; that in 1975, opposer began a promotional campaign for its Canadian restaurants whereby promotional materials were distributed at tourist information booths in southern Ontario; that these promotional packages contained dis **\*1048** count coupons and take-out menus using the term "MOTHER'S"; that some 50,000 promotional packages were distributed in the summer of 1975 and the promotional campaign has continued every summer to the present with over 100,000 promotional packages distributed in 1981; and that Americans have dined in opposer's Canadian restaurants as evidenced by a market survey as well as letters from Americans containing comments about their dining experiences at opposer's restaurants as well as business inquiries concerning franchise opportunities from interested Americans. It is opposer's position that applicant, not having taken any testimony or offered any evidence, is limited to its filing date as its date of first use (October 14, 1976); that the aforementioned promotional activities of opposer predated applicant's filing date; and that by virtue of opposer's radio spot advertising and promotional efforts directed to Americans entering Canada from the United States along tourist routes, opposer created good will in the United States market and established service mark rights in "MOTHER'S" and "MOTHER'S PIZZA PARLOUR & SPAGHETTI HOUSE" as of 1971. In support of this position, opposer is able to cite only one case, Koffler Stores Ltd. v. Shoppers Drug Mart, Inc., 193 USPQ 165 (E.D. Mich. 1976). However, the Koffler case presented a much different situation from the instant case. In the Koffler case, the

COPR. © 2006 The Bureau of National Affairs, Inc.

218 U.S.P.Q. 1046                                                    Page 3
1983 WL 51992 (Trademark Tr. & App. Bd.), 218 U.S.P.Q. 1046
(Cite as: 218 U.S.P.Q. 1046)

plaintiff, a Canadian drug store chain, obtained a United States registration for the mark "SHOPPERS DRUG MART" on February 12, 1974. The Court held that the defendant, a Detroit, Michigan area drug store chain, did not use the mark "SHOPPERS DRUG MART" in connection with its stores until April or May, 1974, a date subsequent to the issuance of plaintiff's registration. The remarks of the court regarding plaintiff's radio advertising on Ontario radio stations reaching the Detroit area and other United States cities related to plaintiff's unfair competition claim against defendant based on the common law principles of unfair competition. The Court noted with respect to this claim of unfair competition that defendant's activities were such as to negate any inference of innocent adoption by the junior user and further, that plaintiff's advertising was extensive and a significant amount of the advertising originated in the United States. The present situation involves no such unfair competition claim and our view coincides with the Court in Mother's Restaurants Inc. v. Mother's Bakery, Inc., 210 USPQ 207 (W.D. N.Y. 1980) where in response to plaintiff's (opposer's) argument that it should be accorded an actual use date of 1971 by virtue of Canadian radio broadcasts reaching New York and the citation of the Koffler case, supra' the Court said: "The court does not in any case find this argument compelling, nor do I find the evidence supporting it strong; the Koffler Stores, Ltd. v. Shoppers Drug Mart, Inc., 434 F.Supp. 697 (E.D., Mich. 1976), case involved a much different set of circumstances." Accordingly, we decline to hold that opposer's promotional activities in Canada regarding "MOTHER'S" and "MOTHER'S PIZZA PARLOUR & SPAGHETTI HOUSE" prior to 1976 resulted in superior rights in said marks in the United States so as to preclude applicant from registering a confusingly similar mark. Rather, it is our view that prior use and advertising of a mark in connection with goods or services marketed in a foreign country (whether said advertising occurs inside or outside the United States) creates no priority rights in said mark in the United States as against one who, in good faith, has adopted the same or similar mark for the same or similar goods or services in the United States prior to the foreigner's first use of the mark on goods or services sold and/or offered in the United States [Cf. Johnson & Johnson v. Diaz, et al., doing business as Johnson Laboratories, 172 USPQ 35 (DC CD Ca 1971], at least unless it can be shown that the foreign party's mark was, at the time of the

adoption and first use of a similar mark by the first user in the United States, a "famous" mark within the meaning of Vaudauble v. Montmartre, Inc., 20 Misc 2d 757, 193 NYS 2d 332, 123 USPQ 357 (N.Y. Sup. Ct. 1959). Under the circumstances, we will limit our determination of the question of likelihood of confusion to an analysis of the mark covered by opposer's registration "MOTHER'S PIZZA PARLOUR" for restaurant services vis-a-vis the mark covered by applicant's application "MOTHER'S OTHER KITCHEN" for carry out restaurant services.

Since opposer's restaurant services are not otherwise restricted, said services are considered to include all types of restaurant services, including carry-out restaurant services of the type recited in the identification of goods in applicant's application. Therefore, the only issue is whether the contemporaneous use of "MOTHER'S PIZZA PARLOUR" and "MOTHER'S OTHER KITCHEN" in connection with identical services would be likely to cause confusion as to the origin of the services, for purposes of Section 2(d) of the Trademark Act.

It is applicant's position that the marks as a whole are distinguishable from each other; and that the only common element in the respective marks is the word "MOTHER'S" *1049 which is a weak term. Applicant has relied on the U.S. District Court decision in Mother's Restaurant, Inc. v. Mother's Bakery, Inc., supra, wherein the plaintiff therein (opposer) successfully argued no likelihood of confusion between, inter alia, "MOTHER'S PIZZA PARLOUR" and "MOTHER'S BAKERY", both for restaurants. Applicant has pointed out that in that case, plaintiff argued that "MOTHER'S" was a weak mark used frequently in various businesses, including restaurants. Applicant concludes by asserting that in view of opposer's prior judicial admissions and the prior decision by the Court in the Mother's Restaurant, Inc. case, supra, opposer may not now argue likelihood of confusion between the two marks since the only commonality between the instant marks is, as was the case in the prior action, the word "MOTHER'S."

Opposer, on the other hand, denies that the opposition is based solely on the existence of "MOTHER'S" in both marks. Opposer asserts that the marks as a whole generate the same commercial impression and render the marks confusingly similar. Opposer argues that "PIZZA PARLOUR" and "OTHER KITCHEN" as used in connection with "MOTHER'S" all bring to mind locations where

218 U.S.P.Q. 1046                                                                                                          Page 4
1983 WL 51992 (Trademark Tr. & App. Bd.), 218 U.S.P.Q. 1046
**(Cite as: 218 U.S.P.Q. 1046)**

"MOTHER'S" might have done her good old-fashioned cooking; that applicant's use of "OTHER" implies that there is another location where "Mother" cooks outside her home; and that the decision in the Mother's Restaurant's Inc. case supra, relied on by applicant is not inconsistent with a finding of likelihood of confusion herein.

[2][3] Although applicant has argued that the term "MOTHER'S" is weak in connection with restaurant services, the record is devoid of any evidence whatsoever to support such a claim. While it is clear that the word "mother's" is a commonly used word in everyday language, this fact is not determinative of whether such a term can become a trademark or whether such a trademark is strong or weak. The Court, in the Mother's Restaurant's Inc., case, supra, concluded that "MOTHER'S" was a relatively weak mark. However, that conclusion was based on an affidavit made of record in that case. While said affidavit was that of counsel for opposer herein, and while we recognize that the affidavit appears to be an admission against interest in that it represents a position inconsistent with the position taken herein by opposer, nevertheless such an admission is not conclusive. See: Movement Corporation v. Air Lift Company, 174 USPQ 395 (CCPA 1972) and cases cited therein. While the position adopted by opposer in the prior case may be considered as a fact illuminative of shade and tone in the total picture confronting the Board, we may not be relieved of reaching our own conclusion based on the entire record. See: Interstate Brands Corporation v. Celestial Seasonings, Inc., 198 USPQ 151 (CCPA 1978); Lasek & Miller Associates v. Rubin, et al. 201 USPQ 831 (TTAB 1978). In the present case, we cannot presume to know the contents of the affidavit in the prior proceeding nor can we take judicial notice of the weakness of a term without any factual support. Accordingly, we decline to hold, on the record presented before us, that "MOTHER'S" is a weak mark as applied to restaurant services. Moreover, it should be noted that the prior decision in Mother's Restaurant's Inc., supra, was based in part on several factors not relevant here such as the different logos and typefaces of the respective marks as well as the fact that while plaintiff's mark "MOTHER'S PIZZA PARLOUR" suggested that one could obtain pizza at the establishment, the other mark "MOTHER'S BAKERY" made no such impression.

[4][5] In the present case, both marks are dominated by the identical word "MOTHER'S." The "PIZZA PARLOUR" portion of opposer's mark, which has been properly disclaimed, is clearly subordinate matter which merely indicates the type of food obtained at opposer's restaurant. Similarly, the term "KITCHEN" is virtually devoid of any trademark significance as applied to applicant's carry-out restaurant services and has been disclaimed. While the differences between the marks are readily apparent from a side-by-side comparison, such comparison is not the proper test in evaluating the question of likelihood of confusion since that is not the way customers will come in contact with the marks in the marketplace. See: L. Leichner (London) Limited v. Robbins, 189 USPQ 254 (TTAB 1975) and cases cited therein. Rather, we must look to the general overall commercial impression created in the mind of the consumer whose memory of a mark is imperfect. See: Glamorene Products Corporation v. Boyle-Midway, Inc., et al., 188 USPQ 145 (SDNY 1975); Sealed Air Corporation v. Scott Paper Company, 190 USPQ 106 (TTAB 1975) and cases cited therein. We conclude that purchasers familiar with "MOTHER'S PIZZA PARLOUR" restaurants would, upon coming into contact with "MOTHER'S OTHER KITCHEN" carry out restaurants, be likely to believe that they were somehow related as to ownership or that they otherwise shared a common sponsorship or origin. Accordingly, we hold that confusion as to source or origin would be likely for purposes of Section 2(d) of the Trademark Act.

*1050 Decision

The opposition is sustained and registration to applicant is refused.

FN1 Application Ser. No. 103,201 filed Oct. 14, 1976, with an alleged date of first use of January, 1976.

FN2 Reg. No. 1,040,322 issued May 25, 1976. Section 8 affidavit accepted. The application which matured into this registration was filed on Sept. 17, 1971.

FN3 While the status and title copy of opposer's pleaded registration showed ownership of said registration in another entity, opposer has proved its ownership of the registration through testimony of one of its witnesses.

FN4 "Commerce the word 'commerce'

COPR. © 2006 The Bureau of National Affairs, Inc.

218 U.S.P.Q. 1046                                                        Page 5
1983 WL 51992 (Trademark Tr. & App. Bd.), 218 U.S.P.Q. 1046
(Cite as: 218 U.S.P.Q. 1046)

means all commerce which may lawfully be regulated by Congress." Sec. 45, Trademark Act, 15 U.S.C. § 1127 (1976).

FN5 The Act of Feb. 20, 1905, Chapter 592, § 1, 33 Stat. 724, provided that "the owner of a trademark used in commerce with foreign nations, or among the several states or with Indian Tribes, * * * may obtain registration for such trademark * * *" (emphasis added).

FN6 Even under the treaty power, priority based on foreign activities has been recognized or proposed only where based on a filing of a regular national application, (e.g. Paris Convention) or an application for international registration (e.g. Madrid Agreement for the International Registration of Marks; Trademark Registration Treaty). See Allen, "Trademark Registration Treaty, Its Implementing Legislation" 21 IDEA, THE JOURNAL OF LAW AND TECHNOLOGY 161 (PTC Research Foundation of the Franklin Pierce Law Center, 1980).

FN7 Paragraph (1) of Article 6 bis reads: "The countries of the Union undertake * * * to refuse * * * the registration of a trademark which constitutes a reproduction, imitation or translation, liable to create confusion, of a mark considered by the competent authority of the country of registration to be well-known in that country as being already the mark of a person entitled to the benefits of the present convention and used for identical or similar goods. * * *" Paris Convention, Act of London, 1934, 53 Stat. 1748, T.S. No. 941. The London text is the most recent Act to which both the United States of America and Canada are bound. INDUSTRIAL PROPERTY, Jan. 1, 1983 (W.I.P.O. 1983)

FN8 Another treaty question is whether the article even applies to service marks under the London text. The first reference to service marks in the Paris Convention was in the Lisbon Act of 1958, to which Canada has not acceded.

Allen, Member, concurring in part, dissenting in part.

I fully agree with the decision of the majority holding that opposer's pre-1976 promotional activities in Canada, including spillover advertising into the United States, on behalf of "MOTHER'S" and "MOTHER'S PIZZA PARLOUR & SPAGHETTI HOUSE" restaurants in Canada did not bestow upon opposer any superior rights in these service marks in the United States. However, it seems to me that this holding rests on a more solid foundation than that which is set forth in the majority opinion. Since this holding is pivotal to my opinion as to our final decision in the case, this additional support is set forth below.

Firstly, the state of the law prior to enactment of the Trademark Act of 1946, 15 U.S.C. § 1052 et seq. (1976) was as declared by the Court of Appeals for the Second Circuit in Le Blume Import Co. v. Coty, 293 F. 344 (1923). That court held a follows:

> But the right of Coty to protect his trademark "Lorigan" or his right to use "L'Origan" upon his perfumes in the United States is not dependent upon whether he has any exclusive right to the trade mark or to the trade name in France. It cannot be denied that the protection of a trade mark in the United States is not to be defeated by showing a prior use of a like trade mark in France, or in some other foreign country. It is not essential that one who claims protection of his trade mark should in all cases be able to show that he first used it. The prior use of a mark by another in some foreign country is not fatal if the one claiming protection is able to show that he was first to use it in this country.

See also, Coty, Inc. v. Parfums de Grande Luxe, Inc., 298 F. 865 (2nd Cir. 1924), cert. denied, Parfums De Grande Luxe, Inc. v. Coty 266 U.S. 609; Moxie Co. v. Noxie Kola Co., 29 F. Supp. 167, 42 USPQ 443 (D. N.Y. 1939); Fraser v. Williams, 61 F. Supp. 763, 66 USPQ 482 (D. Wis. 1945).

Decisions under the Trademark Act of 1946 continued -- with one notable exception, as hereinafter discussed -- to follow these pre-Lanham Act precedents. Most of the cases involved trademarks used on products sold in the foreign country but not in foreign commerce with the United States, the unsuccessful claim of United States priority having been based on advertising or some other activity affecting American citizens or touching American territory. E.g. Oland's Breweries, Ltd. v. Miller Brewing Co., 189 USPQ 481 (TTAB 1975)

COPR. © 2006 The Bureau of National Affairs, Inc.

218 U.S.P.Q. 1046                                                                                              Page 6
1983 WL 51992 (Trademark Tr. & App. Bd.), 218 U.S.P.Q. 1046
**(Cite as: 218 U.S.P.Q. 1046)**

aff'd, 548 F.2d 349, 192 USPQ 266 (CCPA, 1976) [Publicizing "SCHOONER" beer in magazines circulated in the United States and on U.S. radio stations, aimed at United States tourists visiting the Maritime provinces in Canada, held not sufficient to establish technical trademark use in United States, albeit such activities were sufficient to rebut a presumption that Canadian owner had abandoned that mark, the United States registration of which had inadvertently been cancelled due to failure to file § 8 declaration.]; Sterling Drug Inc. v. Knoll A.-G. Chemische Fabriken, 159 USPQ 628, 630 (TTAB 1968) [Neither advertising in foreign publication which may be found in United States libraries nor therapeutic use of trademarked drug "TALUSIN" on U.S. citizens in U.S. military hospital in Germany held sufficient to establish priority in United States.] See also, Interlego A.G. v. Leslie Henry Co., 214 F. Supp. 238, 136 USPQ 601, 605 (M.D. Pa. 1963); S Maw Son & Sons, Ltd. v. Mochida Pharmaceutical Mfg. Co., 138 USPQ 652, 653 (TTAB 1963); Johnson & Johnson v. Diaz, supra, 172 USPQ 35, 37. At least one decision involved services. Intermed Communications, Inc. v. Chaney, 197 USPQ 501 (TTAB 1977) [Promotional activity of Dr. Chaney in the United States concerning public health services rendered in Southeast Asia, held insufficient to establish priority for Chaney in the service mark "INTERMED" in the United States.]

Determination of the issue should not be influenced by whether the case involves goods or services. Although the requirement of use is more easily satisfied in the case of services -- use in advertising being sufficient -- the definition of commerce in the Trademark Act of 1946 is the same for either kind of mark. [FN4] There has been a change in this definition from the predecessor statute, however. [FN5] This **1051** difference brings us to the previously referred to exception, i.e., In re Silenus Wines, Inc., 557 F.2d 806, 194 USPQ 261 (CCPA 1977). In Silenus, the Court drew attention to the definitional difference and noted that the Patent and Trademark Office had been determining "use in commerce" issues as if the definition had not been changed. In fact, as the Court conceded, Silenus, at 194 USPQ 264, 265, there was significant evidence in the legislative history that no change had been intended. Nevertheless, it held in Silenus that the statutory language of the 1946 Act was clear and unambiguous and, consequently, it must be applied without regard to the seemingly inconsistent, yet ambiguous, history. Silenus, at 194 USPQ 266. Accordingly, the question raised herein must be evaluated in the light of Silenus. In my opinion, the

result in this case is the same. In Silenus, the importation of wine, followed by its intrastate sale by the importer, was held to have had a sufficient impact on foreign commerce to satisfy the "commerce which may lawfully be regulated by Congress" test, citing Katzenbach v. McClung, 379 U.S. 294 (1964), for its authority on the broad scope of federal regulatory power under the commerce clause. However, in the instant case, the only impact of the spillover advertising is on commerce within Canada. The rendering of the services is in Canada, by Canadian persons and entities. The profit, if any, emanating from the rendering of such services accrues to Canadian citizens. To avail oneself of the services one must be in Canada. Thus, there is no impact as a result of the spillover advertising on commerce *between* Canada and the United States. Accordingly, the prior spillover advertising of "MOTHER'S" and "MOTHER'S PIZZA PARLOUR & SPAGHETTI HOUSE" created no rights or priority for opposer in the United States.

It should be added that the contrary result urged by opposer herein would have enormous consequences, in terms of uncertainty, on our trademark system. Considering the rapid technological advances in telecommunications, especially satellite communications, a television signal transmitting advertising of a restaurant in a distant foreign land can be captured and viewed or retransmitted in the United States by the use of sophisticated disk antennae aimed at the communications satellite and associated equipment. See, Eastern Microwave, Inc. v. Doubleday Sports, Inc., 691 F.2d 125, 216 USPQ 265 (2nd Cir. 1982), where the process is described. Thus, if mere use of a mark in restaurant services advertising created rights in the United States, without a filing somewhere on a Register capable of being searched, the adoption of a restaurant mark in the United States would be extremely hazardous. [FN6]

As for the possibility that protection might be accorded in the United States to a restaurant name which, although not used in the United States commerce, is, nevertheless, well-known in this country, it seems to me that the Vaudable decision according protection to the famous "MAXIM's" restaurant name in the United States, cited by the majority, is inapplicable to this case since that decision was based on a theory of unfair competition, namely misppropriation, under the law of the State of New York. Vaudable, 123 USPQ at 358; See discussion in 2 LADAS, PATENT, TRADEMARKS AND RELATED RIGHTS, 1560, 61 (1975). Under

COPR. © 2006 The Bureau of National Affairs, Inc.

218 U.S.P.Q. 1046                                                                                                   Page 7
1983 WL 51992 (Trademark Tr. & App. Bd.), 218 U.S.P.Q. 1046
**(Cite as: 218 U.S.P.Q. 1046)**

Federal law, it seems to me that application of the well-known marks doctrine depends upon whether the applicable text of the Paris Convention, in this case, the 1934 London text, and, in particular, Article 6 bis of that Convention, [FN7] is self-executing. See, Vanity Fair Mills, Inc. v. Eaton Co., 234 F.2d 622, 109 USPQ 438 (2d Cir. 1956), cert. denied 352 U.S. 871; See generally, 1 LADAS, PATENTS, TRADEMARKS, AND RELATED RIGHTS, 220-226 (1975). [FN8] However, we need not deal with this matter since the facts in the record of the instant case clearly do not support an inference that either "MOTHER'S" or "MOTHER'S PIZZA PARLOUR & SPAGHETTI *1052 HOUSE" were ever well-known marks in the United States. Even the New York Courts have declined to apply the Vaudable decision in such circumstances. Falmouth Corporation v. Soloweys Heroine, Inc., 168 USPQ 314 (N.Y. Sup. Ct. 1970).

Having no prior United States rights in "MOTHER'S," the only remaining issue is whether "MOTHER'S PIZZA PARLOUR" and "MOTHER'S OTHER KITCHEN" are confusingly similar marks. I disagree with the majority's conclusion as to this issue. Admittedly, applicant's record is virtually devoid of any meaningful evidence on the question whether purchasers are likely to be confused because the term "MOTHER'S" is common to both marks. However, I do not think we can ignore the obvious fact that "mother" has in our society a very close and intimate relationship with the preparation and serving of food which is, after all, the primary purpose of restaurant services. The Courts and reviewing authorities of this Office have fairly consistently accorded very narrow protection to marks comprising the term "mother" or "mother's". Nebraska Consolidated Mills Co. v. Penn, 121 USPQ 94 (Comm'r Pats. 1959) ["MOTHER BESSIE'S" for pone bread not likely to be confused with "MOTHER'S BEST" for wheat flour, prepared mixes, and corn meal]; Creamette Co. v. Kientzel Noodle Co., 119 USPQ 222 (Com'r Pats. 1958) ["MA's BRAND" for noodles, soup mixes, etc. held not likely to be confused with "MOTHER'S" for noodles etc.]; Nebraska Consolidated Mills Co. v. Quaker Oats Co., 118 USPQ 454 (Com'r Pats. 1958) ["MOTHER'S BEST" for wheat flour not confusingly similar with "MOTHER'S" for the same goods, long concurrent use having produced no instances of confusion.] Nebraska Consolidated Mills Co. v. Shawnee Milling Co., 99 F. Supp. 70, 90 USPQ 303 (W.D. Okla. 1951), aff'd, 198 F.2d 36, 94 USPQ 19 (10th Cir. 1952) ["MOTHER'S PRIDE" and "MOTHER'S BEST," both applied to bread, held not

confusingly similar due to dissimilarity of the second words and of their labels.] In Nebraska Consolidated v. Shawnee, the oldest of the cited decisions, Chief Judge Vaught of the District Court had the following comments about the word "mother":

> The word or identity "mother" is just as old as the human race. It had its origin in the Garden of Eden when Eve became the first mother. The name mother is so intimately associated with the home and the family that one is never thought of without the other. In our modern commercial life the word mother has become so attached to everything connected with the home than the name has taken on commercial significance and has been applied or attached to almost every home article or device which would appeal to the buying public. There is not only mother's flour, but mother's oats, mother's cocoa, mother's mayonnaise, mother's salad dressing, mother's sandwich spread, mother's meal, mother's syrup, mother's extracts, and many other articles for home use. The word, therefore, has become so universal in meaning and in use that its exclusive use for any commercial purpose has been judicially prohibited. 90 USPQ at 306.

Accordingly, I do not believe we need any evidence to conclude that purchasers would look to other words in the respective marks of the parties herein as having considerable importance in distinguishing the parties' services. These other words are patently dissimilar in sight, sound and (it seems to me) meaning.

I also do not share the majority' view that the two marks herein involved have similar commercial impressions. The idea that "MOTHER'S PIZZA PARLOUR" is "mother's other kitchen", i.e. the other kitchen where she makes pizza is too strained, in my view, to result in purchaser confusion. Accordingly, I would dismiss the opposition.

P.T.O. T.T.A.B.

218 U.S.P.Q. 1046

END OF DOCUMENT

COPR. © 2006 The Bureau of National Affairs, Inc.

**EXHIBIT D**

Westlaw.

123 U.S.P.Q. 357

20 Misc.2d 757, 193 N.Y.S.2d 332, 123 U.S.P.Q. 357

**(Cite as: 123 U.S.P.Q. 357)**

Page 1

C

VAUDABLE et al.

v.

MONTMARTRE, INC., et al.

New York Supreme Court, Special Term, New York County

Decided Oct. 26, 1959
United States Patents Quarterly Headnotes

**UNFAIR COMPETITION**
**[1] Names--Secondary meaning (§ 68.725)**

Whatever the source of name, it is origination and development of its use in particular field which may entitle user thereof to protection by virtue of secondary meaning acquired therein.

**UNFAIR COMPETITION**
**[2] Competition essential (§ 68.30)**
**Fraud, deception and palming off (§ 68.55)**
**Names--Hotels and restaurants (§ 68.713)**

Plaintiff is proprietor of "Maxim's" restaurant in Paris; restaurant has unique and eminent position as restaurant of international fame and prestige; it is well known in New York City; it is unfair competition for defendant to use "Maxim's" as name of its New York City restaurant, especially since defendant endeavors to create illusion of identity with plaintiff's restaurant; defendant's purpose is to appropriate good will plaintiff created in name; fact that parties are not in present actual competition is immaterial; wrongful attempt to suggest association warrants relief to prevent confusion in public mind as well as dilution of plaintiff's trade name; the more distinctive and unique the name, the greater the need for protection from dilution of its distinctive quality.

**UNFAIR COMPETITION**
**[3] In general (§ 68.01)**

Trend of the law, both statutory and decisional, has been to extend scope of doctrine of unfair competition, whose basic principle is that commercial unfairness should be restrained whenever it appears that there has been a misappropriation, for advantage of one person, of property right belonging to another.

**UNFAIR COMPETITION**
**[4] Defenses (§ 68.40)**

Mere failure to proceed against users of plaintiff's trade name in other fields or areas is not such acquiescence as precludes injunction against defendant in field or area where plaintiff's interests are involved.

**UNFAIR COMPETITION**
**[5] Names--In general (§ 68.701)**

Abandonment of name of Parisian restaurant is not shown although restaurant was closed during World War II, since it was reopened in 1946 and fully developed thereafter; to constitute abandonment, there must not only be nonuser but intent to abandon; facts show that there was no intent to abandon.

**\*357** Action for unfair competition. On plaintiffs' motion for summary judgment. Motion granted.

GREENBERG, Justice.

Plaintiffs, owner and operator of the famous Maxim's restaurant in Paris, move for summary judgment in this action for a permanent injunction restraining defendants, owner and operator of a newly opened restaurant in the Gramercy Park section of this city, from using the name Maxim's. A motion for summary judgment may now be made in any action (new Rule 113, adopted effective March 1, 1959) and should be granted where there are no triable issues of fact and the claim is sufficiently established to warrant the court as a matter of law in directing judgment.

**\*358** The French restaurant, "Maxim's," was established in 1893 by an individual whose given name was Maxime. It was subsequently sold and all rights therein acquired by plaintiffs. It received wide publicity as the setting of a substantial portion of Lehar's operetta, "The Merry Widow," has been the subject over a long period of years of numerous newspaper and magazine articles, and has been mentioned by name and filmed in movies and television. There is no doubt as to its unique and eminent position as a restaurant of international fame and prestige. It is, of course, well known in this country, particularly to the class of people residing in the cosmopolitan city of New York who dine out. Plaintiffs have registered the mark Maxim's with the

COPR. © 2006 The Bureau of National Affairs, Inc.

123 U.S.P.Q. 357                                                                                    Page 2
20 Misc.2d 757, 193 N.Y.S.2d 332, 123 U.S.P.Q. 357
**(Cite as: 123 U.S.P.Q. 357)**

United States Patent Office for catering services and wines, and have merchandised and sold food products under that name, or a variant thereof, in the United States.

The affidavits and exhibits establish not merely that defendants copied the name Maxim's but endeavored to create the illusion of identity with plaintiffs' restaurant. They took the name of Montmartre, a Parisian subdivision, as their corporate name. The decor of their restaurant is so similar in its red and gold color scheme to the French restaurant as to be described in a newspaper article as its "replica." The most significant evidence, however, is the imitation of plaintiffs' distinctive style of script printing of the name Maxim's. Defendants' form of denial is pregnant with admission of the charge. They deny the distinctive script printing in their use of the name Maxim's on the doormat, the match books and the menus, but do not deny such type of printing on the awning, over the door, on credit application cards and in their advertising. The exhibits annexed prove the truth of the charge.

Defendants contend that the name "Maxim" became popular after the invention by two gentlemen bearing that name of smokeless powder and the machine gun and that it has been used in many different types of business. But plaintiffs and their predecessors in title made this name famous in the high-class [1] restaurant field. Whatever the source of the name, it is the origination and development of its use in a particular field which may entitle the user thereof to protection by virtue of the secondary meaning acquired therein.

[2] It is obvious that defendants' purpose is to appropriate the good will plaintiffs have created in the name Maxim's as a restaurant establishment. The fact that they are not in present actual competition is immaterial. Maison Prunier v. Prunier's Restaurant & Cafe, Inc., 159 Misc. 551. A wrongful attempt to suggest an association or connection of some sort is sufficient to warrant relief to prevent confusion in the public mind as well as dilution of plaintiffs' trade name (Burrough, Ltd. v. Ferrara, 8 Misc. 2d 819, 113 USPQ 233); and the more distinctive and unique the name, the greater the need for protection from dilution of its distinctive quality. Tiffany & Co. v. Tiffany Productions, Inc., 147 Misc. 679, aff'd 237 App.Div. 801, aff'd 262 N.Y. 482.

[3] The trend of the law, both statutory and decisional, has been to extend the scope of the doctrine of unfair competition, whose basic principle is that commercial unfairness should be restrained whenever it appears that there has been a misappropriation, for the advantage of one person, of a property right belonging to another. See Dior v. Milton, 9 Misc.2d 425, 110 USPQ 563, aff'd 2 App. Div.2d 878, 113 USPQ 210; Federal Trademark Act of 1946; and section 368-c of the New York General Business Law, enacted in 1954. These plaintiffs are clearly entitled to relief in view of defendants' appropriation of their trade name and calculated imitation of features associated with plaintiffs' restaurant.

[4] No evidence sufficient to create a triable issue of estoppel has been set forth by defendants. Mere failure to proceed against users of the name in other fields or areas is not such acquiescence as precludes the granting of injunctive relief against the present defendants in a field or area where plaintiffs' interests are involved. Menendez v. Holt, 128 U.S. 514; Nat. Lead Co. v. Wolfe, 223 F.2d 195, 105 USPQ 462; Standard Oil Co. v. Standard Oil Co., 252 F.2d 65, 116 USPQ 176. [5] Nor is there any evidence of abandonment. The Parisian restaurant, closed during the war, was reopened in 1946 by plaintiffs and fully developed thereafter with expansion of certain activities into other fields and countries. "To constitute an abandonment there must not only be non-user but an intent to abandon." Rockowitz C. & B. Corp. v. Madame X Co., Inc., 248 N.Y. 272, 276. The facts here shown establish the very reverse of an intent to abandon.

Plaintiffs are accordingly entitled to an injunction restraining defendants from use of the name "Maxim's" and to an assessment to ascertain the amount of damages, if any, occasioned by defendants' wrongful acts of unfair competition, as demanded in the complaint. Settle order.

N.Y.Sup.

123 U.S.P.Q. 357

END OF DOCUMENT

COPR. © 2006 The Bureau of National Affairs, Inc.

## Certificate of Service

I hereby certify that on this day, I caused a true and accurate copy of the foregoing document to be served upon Margaret H. Paget, Esq., SHERIN AND LODGEN LLP, 101 Federal Street, Boston, Massachusetts 02110, by complying with this Court's Administrative Procedures for Electronic Case Filing.

Dated: February 24, 2006                    /s/ Geri L. Haight
                                            Geri L. Haight

LIT 1555649v.1